[No. B033117. Second Dist., Div. Six. Sept. 15, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
BEN E. JOHNSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. The portions to be published follow.

COUNSEL

Thomas F. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Carol Wendelin Pollack and Alison Braun, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GILBERT, J.—We affirm the conviction of Ben E. Johnson for violation of state securities law. (Corp. Code,[1] § 25401.)

Section 25401 provides: "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." We hold that section 25401 does not require proof of defendant's scienter.

FACTS

In 1983 defendant Ben E. Johnson became a general partner in four limited partnerships formed to build and manage emergency care medical centers. Each partnership concerned a particular medical center—Goleta, Oxnard, Camarillo, and Santa Maria.

The first partnership built and successfully operated the "Goleta Imedicenter." The second and third partnerships built and operated medical centers in Oxnard and Camarillo but without financial success. These two centers eventually closed. The fourth partnership was capitalized with $402,280 to build and manage a medical center in Santa Maria. No construction occurred and although several limited partners in that partnership received refunds, most lost their investment.

Thereafter, Johnson was charged with violating California securities laws. A first trial resulted in a divided jury; a second trial concluded with a securities law conviction under section 25401. Evidence at trial established

---

[1] All statutory references are to the California Corporations Code unless otherwise stated.

the following: In 1983 and 1984 Johnson owned Preferred Administrators, a business that collected insurance premiums from insured persons and processed claims on behalf of the insurance company. He employed Sharon McGaffey as an administrator and vice-president. Doctor Kenneth Frank approached Johnson and proposed a business venture to develop emergency medical care centers. Subsequently, Frank and Johnson became general partners of a limited partnership that sought to build and manage an emergency medical care center in Goleta, known as the "Goleta Immedicenter."

The private placement prospectus for the Goleta Immedicenter partnership stated that $350,000 capitalization was required to build and manage the center until it obtained a profit; $150,000 of that $350,000 was to be held as a reserve for operating expenses. The partnership soon obtained limited partners who contributed $350,000, but that amount was reduced to $315,000 by finders' fees as authorized by the prospectus.

Soon after, Johnson and Frank formed other limited partnerships to build and operate emergency care medical centers in Oxnard, Camarillo and Santa Maria. The private placement prospectuses for these partnerships were similar to the Goleta prospectus but the capitalization amounts were higher. Santa Maria and Oxnard, for example, were capitalized at $420,000. Capitalization was higher because Johnson realized that the Goleta Immedicenter was "very expensive" and "not enough money had been raised" to capitalize it.

McGaffey, an employee and officer of Johnson's insurance administration business, performed the bookkeeping for all Immedicenter partnerships. Although each partnership had a separate savings account, there was one operating bank account for all partnerships. McGaffey testified that Johnson and Frank authorized her to pay expenses through this one operating account. She deposited investor funds into the operating account as needed to pay expenses for any of the partnerships, without determining "whether . . . the bills . . . applied to one center versus another center . . . ."

Some funds she deposited directly into the operating account; others, she transferred from a particular partnership's savings account. McGaffey also testified that Johnson authorized the transfer of funds from particular savings accounts to the operating account. Johnson, the managing general partner, was responsible for the financial administration of the partnerships.

Although the Goleta partnership only had $315,000 in working capital, expenses to construct and operate the Goleta center from April 1983 to March 1984 were $596,384.03. Part of these expenses was due to an increase in construction costs from $70,000 as projected in the prospectus to

ultimately $184,436 in actual costs. There were insufficient funds from patient services to meet this shortfall.

By July or August 1983, when Goleta was still under construction, the contractor had informed Johnson that construction costs would be approximately $160,000. At that time, Santa Maria and the other partnerships were selling partnership interests. There was no evidence that Johnson requested the Goleta limited partners to contribute additional capital based upon the increased Goleta construction costs estimate.

The Oxnard partnership expenses also exceeded its capital. Through March of 1984, $422,855 was spent on the Oxnard medical care center, but the partnership acquired only $382,480 in capital.

The Santa Maria partnership had working capital of $402,280. McGaffey put $174,000 of that amount into the Santa Maria savings account and $228,280 directly into the operating bank account. She first placed these Santa Maria partnership funds into the operating bank account in August 1983, when Johnson and Frank were still soliciting investors for the Santa Maria partnership. Only $115,627 of the Santa Maria capital was used for purposes of that partnership.

By March 1984, $320 remained of the Santa Maria $402,280 initial working capitalization. Gary Linker, a Santa Maria limited partner, testified that Johnson informed him in April 1984 that funds from certain partnerships were "temporarily transferred" to support others.

McGaffey also testified that she paid lease expenses and legal professional fees for contemplated emergency care centers in Nevada, Bakersfield and Omaha from the operating bank account. She also paid a hotel bill she incurred in San Francisco after meeting with an investor in Oregon. Johnson authorized her to pay these expenses.

Twelve investors testified concerning their investment in the Santa Maria partnership. Many stated that they inquired prior to investing whether partnership funds would be commingled. Johnson replied that funds would be segregated and not commingled. Investor John O'Brien testified that Johnson informed him at a sales meeting that funds from one partnership would not be used to support any undercapitalized partnership. All 12 investors believed each partnership was separate; acting under this belief, for example, two investors invested in three Immedicenter partnerships "to spread the risk."

In May 1984, Preferred Administrators and all Immedicenters but Goleta went out of business. Although Oxnard and Camarillo had operating

medical care centers, no construction occurred at Santa Maria. This criminal prosecution followed after investors complained to the district attorney.

On appeal Johnson asserts among other contentions that section 25401 requires proof of scienter.

. . . . . . . . . . . . . . . . . . . . . .*

## Discussion

### I.

Johnson contends the trial judge erred by not instructing the jury, either sua sponte or according to his offered instructions, that a violation of section 25401 requires proof of "guilty knowledge." He points out that parallel federal securities statutes require proof that a defendant possessed guilty knowledge before he may be convicted of a criminal offense. (*United States* v. *Koenig* (S.D.N.Y. 1974) 388 F.Supp. 670, 712—the prosecutor must establish that defendant knew the falsity of his representations or that he acted with reckless disregard for the truth.)

He adds that judicial decisions have interpreted California law in other, unrelated crimes to require guilty knowledge before subjecting a defendant to penalties or damages. (*McPheeters* v. *Board of Medical Examiners* (1930) 103 Cal.App. 297, 300 [284 P. 938]—the "willful betraying of a professional secret" by a physician must be construed to mean "actual and conscious infraction of duty"; *Williams* v. *Carr* (1968) 68 Cal.2d 579, 584 [68 Cal.Rptr. 305, 440 P.2d 505]—"willful misconduct" under California's automobile guest statute means an intentional act with express or implied knowledge that serious injury is probable.) He also contends that the free speech guaranties of the federal and California Constitutions require "guilty knowledge" to avoid constitutional infirmity. We reject these arguments for several reasons.

Section 25540 punishes by fine or imprisonment persons who "willfully" violate, inter alia, section 25401. The trial judge instructed the jury that willfully "implies simply a purpose or willingness to commit the act or to make the omission in question. The word does not require any intent to violate the law, or to injure another, or to acquire any advantage." This

---

*See footnote, *ante,* page 1369.

instruction derived from Penal Code section 7, subdivision 1, defining "willfully."

It is settled that the omission of "knowingly" from a penal statute indicates that guilty knowledge is not an element of the offense. (*People* v. *Kuhn* (1963) 216 Cal.App.2d 695, 699 [31 Cal.Rptr. 253].) Had the Legislature intended to require proof of guilty knowledge or scienter under section 25540, it could have so stated by using the word "knowingly." Willfulness does not require proof of evil motive or intent to violate the law or knowledge of illegality. (*People* v. *Clem* (1974) 39 Cal.App.3d 539, 542-543 [114 Cal.Rptr. 359]—according to legislative history of § 25540, evidence of good faith or advice of counsel is not a defense; *People* v. *Gonda* (1982) 138 Cal.App.3d 774, 779 [188 Cal.Rptr. 295]—lack of knowledge of illegality is not a defense to violation of law regulating sale of franchise.)

Many cases involving a violation of section 25401 involve misrepresentations concerning past or present facts. The evidence in such cases usually shows that the defendant knew that when he made the statements they were either not true, or that he made the statements with reckless disregard for the truth. The statute, however, does not require the prosecution to prove the defendant's specific intent or knowledge at the time representation is made. The defendant need not have fraudulently induced the victim to part with his money. In a case such as the one here, where the defendant makes a material representation about conduct in the future, he must act in accordance with that representation irrespective of what his intent or knowledge was at the time the representation was made. Therefore, when Johnson represented he would not commingle funds from the various partnerships, he violated section 25401 when he in fact did commingle the funds. His later act made the statement as promised untrue. To put it another way, section 25401 requires one to keep his promise.

Of course, a defendant acting under a reasonable mistake of fact does not entertain criminal intent according to Penal Code section 26: "All persons are capable of committing crimes except . . . [p]ersons who committed the act or made the omission charged under an ignorance or mistake of fact . . . ." Had evidence or a reasonable inference therefrom existed suggesting that Johnson so acted, this instruction would have been given to the jury. For example, if the evidence showed that despite his instructions to the contrary, Johnson's employees surreptitiously commingled funds, this instruction would have been proper.

As the People point out, there was no testimony that Johnson reasonably believed that investor funds were not being commingled. Thus, neither the

due process nor free speech guaranties are endangered by a criminal statute punishing "willful" but not "knowing" representations or omissions.

Our conclusion is strengthened by section 25541 which punishes willful use of an act or practice that defrauds or deceives. ■ The unambiguous terms "defraud," "fraud," and "deceit" in section 25541 evince a legislative determination to punish knowing conduct. (See *Aaron* v. *SEC* (1980) 446 U.S. 680, 690 [64 L.Ed.2d 611, 622, 100 S.Ct. 1945]—interpreting rule 10(b) of Securities Exchange Act of 1934.) ■ To so construe the term "willfully" as well would render most of the language of section 25541 redundant.

■ Although *Clem* and *Gonda, supra,* concerned the mistake of law defense, we agree with those decisions that the Penal Code section 7 definition of "willfully" does not include any mental state other than a purpose or willingness to commit the act. ■ Had the Legislature intended otherwise, it could have used "knowingly" or "guilty knowledge" in section 25540.

It is true that section 25401 is patterned after section 12(2) of the Securities Act of 1933, and clause (b) of rule 10b-5 under the Securities Exchange Act of 1934. (1A Marsh & Volk, Practice Under the California Securities Laws (1988) p. A-1-593.) ■ It is also true that "[w]hen legislation has been judicially construed and a subsequent statute on the same or an analogous subject is framed in the identical language, it will ordinarily be presumed that the Legislature intended that the language as used in the later enactment would be given the like interpretation. This rule is applicable to state statutes which are patterned after federal statutes. [Citations.]" (*Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 688-689 [8 Cal.Rptr. 1, 355 P.2d 905].)

■ Nevertheless, even though federal cases interpret the federal act as requiring guilty knowledge, that does not mean that California also requires guilty knowledge. ■ California's definition of "willfully" does not encompass guilty knowledge. ■ Federal decisions may be helpful in interpreting state statutes analogous to federal statutes, but those federal decisions are not binding on California concerning the proper interpretation of section 25401. (*Courtney* v. *Waring* (1987) 191 Cal.App.3d 1434, 1440 [237 Cal.Rptr. 233].)

## II.-V.*

. . . . . . . . . . . . . . . . . . . . . . . .

Accordingly, the judgment is affirmed.

Stone (S. J.), P. J., and Abbe, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 21, 1989.

---

*See footnote, *ante*, page 1369.