[No. G043100. Fourth Dist., Div. Three. Dec. 21, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY GORDON BUTLER, Defendant and Appellant.

**COUNSEL**

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**IKOLA, J.**—A jury was asked to decide whether defendant Jeffrey Gordon Butler was guilty of securities fraud and related offenses or, conversely, if he

was merely a failed businessman who did nothing meriting criminal punishment. Believing the former to be true beyond a reasonable doubt as to the majority of counts alleged, the jury convicted defendant of 288 counts of fraud in the offer or sale of a security (Corp. Code, § 25401),[1] 240 counts of offering an unqualified security (§ 25110), four counts of engaging in fraudulent securities schemes (§ 25541), 147 counts of theft from an elder (Pen. Code, § 368, subd. (d)), three counts of filing a false tax return (Rev. & Tax. Code, § 19705, subd. (a)(1)), and one count of aiding in the preparation of a false tax return (Rev. & Tax. Code, § 19705, subd. (a)). Among other enhancement findings, the jury found true allegations that defendant intentionally took property valued in excess of $2.5 million. (Pen. Code, § 12022.6, subd. (a).) The court sentenced defendant to 90 years eight months in prison. Defendant raises numerous issues on appeal, but we affirm the judgment in all respects.

FACTS

*Defendant's Background*

Defendant graduated from high school in Clovis, New Mexico, and attended one year of college at Manhattan Christian College in Manhattan, Kansas. After leaving college, he owned and operated a car detail business in Colorado for one year and a half.

Defendant obtained real estate licenses in Colorado and New Mexico, and unsuccessfully worked in the real estate business in the early 1980s. Defendant then obtained employment at Sandia Savings and Loan for "a couple years," where he "basically handled mortgages and . . . new deposits. I would visit people . . . that had high deposits with the savings and loan and basically customer service them."

Defendant next worked for "over two years" as a deputy treasurer for San Juan County, New Mexico. His duties entailed assisting the treasurer in the collection and investment of property taxes. At the same time, defendant partnered with others to buy rental properties as investments. After moving to Amarillo, Texas, defendant purchased a hair salon, which he expanded to three more locations. Defendant formed a company called "The Butler Group" and expanded into other businesses, including a laundry facility.

In the mid-1980s, defendant's banker introduced defendant to a man who owned four Arby's restaurants in Texas but was facing $300,000 in tax payments to the Internal Revenue Service (IRS). The IRS accepted defendant's offer of $80,000 to take over the restaurants. Defendant needed cash to

---

[1] All undesignated statutory references are to the Corporations Code.

pay off disgruntled suppliers and other bills, so he solicited investments from family members and "ran an ad in the newspaper offering . . . 12-percent interest on notes. And we had people respond to that."

One of these people was Oliver Ottensmeyer. After responding to Butler's newspaper ad, Butler promised Ottensmeyer a high rate of interest (10 or 12 percent) paid monthly. Ottensmeyer invested about $70,000 in an unspecified business venture. He received one or two interest payments. Ottensmeyer invested an additional $131,000 when told about the Arby's restaurant opportunity. Ottensmeyer did not receive any payments from the Arby's investment. Ottensmeyer unsuccessfully tried to contact Butler, but the next communication he received from Butler was a notice of bankruptcy proceedings. Despite filing proofs of claim, Ottensmeyer received nothing from the bankruptcy, which concluded in January 1989. Similarly, Sanford Evans invested $10,000 with defendant in exchange for a 12 percent note. Evans received interest payments for about a year and a half, but did not receive any of his principal back. All in all, defendant brought in approximately $400,000 in investor money using 12 percent promissory notes. Defendant did not "give [the investors] anything but the promissory note." The debts were discharged in bankruptcy.

Defendant moved back to New Mexico and worked in sales for a water filtration system company. Defendant was a top salesman; he would meet with customers in their homes and demonstrate the system. At the same time, defendant obtained an insurance license in New Mexico and started selling a variety of insurance policies.

Defendant subsequently accepted a job with Globe Life and Accident Insurance Company in Riverside, California, in 1992. Defendant obtained a license to sell insurance in California at that time. When this job failed to provide adequate income, defendant pursued a new business in which he sold (as an independent contractor) "gap filler" insurance policies to cover home care for seniors. In 1995, the Department of Insurance closed down the insurance firm that was issuing the policies and put defendant on probation, revoking his license and issuing a restricted license. Defendant had offered and sold home health care services to senior citizens without the required regulatory approval of these products, and had collected large fees in doing so. Defendant paid a fine of $23,000.

*Formation and Operation of Senior-oriented Financial Services Firms*

Undaunted by his bankruptcy, the suspension of his insurance license, and his apparent lack of any particular education or expertise in the complex fields of finance and investment, defendant set his sights on marketing living trusts, wills, annuities, and reverse mortgages to senior citizens.

At some point in the 1990s, defendant formed Senior Information Services (SIS), through which defendant marketed and sold living trusts and wills to senior citizens. SIS used telemarketers and print advertisements to develop leads. Defendant and his sales representatives would then use their knowledge of clients' assets to offer annuity investments.

Defendant also formed a company known as Patriot, which sold reverse mortgages—often to the same SIS clients that defendant solicited to buy annuities (i.e., clients could use the proceeds of the reverse mortgage to buy annuities). Defendant's insurance license was permanently revoked in 2001 based on defendant's sale of reverse mortgages to senior citizens in 1996 and 1997. The Department of Insurance's revocation order stated that eight of defendant's customers were "not informed of the dollar amount of the service fee charged by [defendant] until the loan was complete and payment of the service fee was demanded. Said service fees ranged from $3,400 to $7,705. Each of said eight individuals would not have purchased the reverse mortgages if they had been informed of the dollar amount of the service fee charged by [defendant]. By failing to disclose the amount of the service fee, [defendant] misrepresented a material item or material term of the broker's agreement mentioned here and above."

*Transfer of Investor Funds to Medical Factoring Company Investments*

During the same time period, defendant (and his agents) began working on commission as an independent "finder" for a medical bill factoring company, Medical Capital Corporation (MCC). Defendant also worked as a "finder" for Dawson Group, Inc. (DGI), a firm similarly engaged in medical bill factoring. The factoring firms' business plan was to pay health care providers discounted cash payments for receivables. Both firms (MCC and DGI) offered promissory notes to investors paying 12 percent interest. Both firms rewarded "finders" (like defendant) with 10 percent commissions on the money invested, plus an additional 10 percent commission each year the promissory note was renewed.

Defendant steered his SIS clients into the MCC and DGI investments, sometimes just months after convincing his clients to invest in annuities. By 1998, defendant had approximately 23 clients who collectively invested more than $1 million in DGI. At the peak of "finding" investors for MCC, defendant's investors loaned $8 to $9 million to MCC. Defendant was not charged with crimes as a result of selling MCC and DGI investments.

In 1998, DGI was insolvent. DGI's assets included $332,000 in cash and $1.3 million in uncollected receivables; DGI's liabilities included $2.7 million owed to note investors. DGI's owner told defendant he was going to

notify the investors of the firm's impending bankruptcy. Rather than allowing DGI to declare bankruptcy, defendant agreed to take over DGI, transferring its assets and liabilities to a new business entity. The investors would have received only 10 to 15 percent of their notes' principal values if the remaining money was returned to them. Only $225,000 of the receivables were ultimately collected. In the interim, however, investors continued to receive 12 percent interest payments. Defendant was using money from Patriot and his own compensation to make interest payments to investors.

Defendant was charged with crimes in connection with his transfer of DGI investors into new investments. The first new entity, Medifund, issued new one-year notes to the DGI investors. Defendant changed the name of Medifund to Genessee Capital, Inc. (Genessee), in 2000 and issued new Genessee notes in January 2001. Defendant did not tell DGI investors transferred to Medifund notes about the financial situation of DGI, the intention of DGI's owner to declare bankruptcy, the viable business plan (or lack thereof) of Medifund to recover losses, or defendant's history of failed business ventures. When issuing Genessee notes, defendant made no disclosures about the financial situation of Medifund/Genessee or the business plan (or lack thereof) of Genessee. Defendant also brought new investors into Medifund/Genessee without any of these disclosures.

At some point during this process, Butler consulted an attorney with regard to the issuance of Genessee notes. According to the attorney's testimony, he told Butler the "issuance of promissory notes in California . . . would be deemed an issuance of securities, that the issuance would have to either be qualified or exempt from qualification under either the Commissioner's rules or some provision of California law." Another attorney, who actually prepared the Genessee notes, testified that defendant did not provide her with most of the pertinent information about the investors and the history of the DGI/Medifund investments. The final interest payments to Genessee note-holders occurred in December 2002. Defendant finally told remaining investors that Medifund/Genessee was defunct and their investments were lost. But at the same time, defendant told these investors their money could be recovered from his new venture, Global Network Providers (GNP).

*Investments in Grenada Telecommunications*

Starting in 2000, defendant became involved in yet another line of business, a telecommunications startup company known as GNP, which was located in, of all places, Grenada. GNP had one asset: a license to compete with the existing telecommunications monopoly in Grenada. But GNP did not have any capital or equipment. In need of capital, GNP's promoters, Antonio Bailey and Keith Friday, offered defendant the following terms: (1) his usual

10 percent commission on all promissory notes sold; (2) a 25 percent ownership share of GNP; (3) a position with GNP as chief financial officer; and (4) a salary of $3,000 per month. Defendant was charged with numerous crimes arising out of investments he sold in GNP.

Defendant talked to an attorney about GNP; the attorney advised defendant that the proposed notes were governed by federal and state securities laws. The attorney noted in an e-mail that defendant had an obligation "to disclose all material facts regarding the investment" to his investors. The attorney prepared a summary offering memorandum, which included an explanation of the reasons investment in GNP would be highly risky (e.g., lack of capital, lack of operations, unsecured nature of notes, location in a foreign country, speculative possibility of note repayment). Defendant told this attorney that defendant was familiar with securities law. But defendant never took steps to satisfy securities law requirements such as qualification of the notes or making detailed disclosures.

In response to Bailey suggesting a $6,000 slush fund be set up to make payments to people in Grenada, the GNP attorney told defendant this would violate the Foreign Corrupt Practices Act of 1977 (Pub.L. No. 95-213 (Dec. 19, 1977) 91 Stat. 1494) and that money used for bribes would have to be reported as income because bribes cannot be deducted as a business expense. Nonetheless, defendant wrote a note to his wife which stated: " 'Peggy deduct $6,000 from Nevada account. Cash I'm sending for minister. Spread money among different expenses.' "

Defendant began funneling MCC investors into GNP notes. Defendant told at least some investors that GNP was a telecommunications firm in Grenada. Some investors recall being told GNP was a safe investment. But defendant did not provide an offering memorandum to GNP investors or provide any other disclosures about GNP. Defendant did not disclose he would take 10 percent off the top of any investment, as well as an upfront salary, all from a speculative startup company without equity capital in a foreign country. Defendant did not disclose anything about his past that would be material to an investor (e.g., personal bankruptcy, revocation of insurance license, defendant's maneuvering with regard to DGI/Medifund). Defendant did not disclose that he would pay interest to investors with other investments rather than revenues from business operations (i.e., arguably operate a Ponzi scheme). The victims would not have invested had they known these facts.

From 2000 to 2004, defendant raised $8,331,399.05 by selling notes payable by GNP. Defendant also raised $425,306.67 selling " 'assignments of GNP stock.' " There are some indications GNP made efforts toward its professed goal of competing in the telecommunications market in Grenada.

GNP negotiated with AT&T and other potential corporate partners about joint venture arrangements. GNP also spent money on equipment and facilities. But GNP was never operational and never generated revenues. Thus, GNP paid commissions and salaries to its principals (including defendant) and made interest payments to investors with "diverted" investor money, not revenues. According to an expert witness, GNP was a Ponzi scheme because investors were misled into thinking GNP was achieving a legitimate return on investment by the payment of interest on the notes.

From December 2003 to January 2005, defendant stalled investors with letters describing purported problems in Grenada. But the investors did not receive any additional interest payment or repayments of principal.

*Criminal Charges Brought Against Defendant*

The operative information, which named more than 100 victims, charged defendant with 874 counts, consisting of 309 counts of fraud in the sale of a security (§ 25401), 309 counts of selling an unqualified security (§ 25110), four counts of using a scheme to defraud (§ 25541), 247 counts of theft from an elder (Pen. Code, § 368, subd. (d)), and five counts of filing false tax returns (Rev. & Tax. Code, § 19705, subd. (a)). The jury convicted defendant of 683 counts, as detailed above in the introduction to this opinion. The remainder of the counts did not result in convictions, either because they were dismissed by the court for insufficient evidence after the close of the prosecutor's case or because the jury acquitted defendant or could not agree on a verdict.

## DISCUSSION

Most of defendant's contentions on appeal pertain to his convictions under the Corporate Securities Law of 1968 (§ 25000 et seq.), "a comprehensive reform of California's security laws" whose "primary objective . . . was the 'creation of a balanced regulatory scheme to cope with the problems of modern securities markets in California.'" (*People v. Cole* (2007) 156 Cal.App.4th 452, 472 [67 Cal.Rptr.3d 526] (*Cole*).) This law provides for civil, administrative, and (as here) criminal enforcement. (See *People ex rel. DuFauchard v. O'Neal* (2009) 179 Cal.App.4th 1494, 1501 [102 Cal.Rptr.3d 573]; § 25540 ["any person who willfully violates any provision of this division, or who willfully violates any rule or order under this division, shall upon conviction" be subject to criminal punishment].) Before delving into the particular issues raised by defendant, we pause to provide an overview of the form and function of California securities law and to explain how this regulatory structure applies to the allegations leveled against defendant, who sold unsecured promissory notes to investors.

First things first: what is a security? (See *Reiswig v. Department of Corporations* (2006) 144 Cal.App.4th 327, 333–335 [50 Cal.Rptr.3d 386].) Section 25019 defines a " 'security' " by listing numerous forms of transactions and instruments deemed to be securities, including "any note; stock; . . . bond; debenture; evidence of indebtedness; . . . or participation in any profit-sharing agreement . . . ." "[I]t is clear the Legislature intended that the term have a broad scope 'to protect the public against spurious schemes, however ingeniously devised, to attract risk capital.' " (*People v. Graham* (1985) 163 Cal.App.3d 1159, 1164 [210 Cal.Rptr. 318].) Despite this broad purpose and the inclusion of "any note" in the statutory definition of " 'security,' " not every document labeled as a promissory note is actually a security. (*People v. Figueroa* (1986) 41 Cal.3d 714, 735–736 [224 Cal.Rptr. 719, 715 P.2d 680] (*Figueroa*).) "Unsecured promissory notes are securities if the investor relies on the skill, services, solvency, success, and services of the issuer to ensure payment." (*People v. Simon* (1995) 9 Cal.4th 493, 497, fn. 4 [37 Cal.Rptr.2d 278, 886 P.2d 1271] (*Simon*).) Whether an investment constitutes a security is a question for the finder of fact. (*Figueroa, supra*, 41 Cal.3d at p. 734; *People v. Frederick* (2006) 142 Cal.App.4th 400, 413 [48 Cal.Rptr.3d 585] (*Frederick*).) Here, the jury found the notes peddled by defendant were securities and this finding is not challenged on appeal.

There are a variety of ways one might violate California securities law, including (1) failing to obtain licensing as a "broker-dealer" of securities (§ 25210; *Cole, supra*, 156 Cal.App.4th at pp. 472–485); (2) failing to comply with registration requirements, such as qualifying nonexempt securities (§§ 25110, 25130)[2] or filing proposed advertising for a security (§ 25300) with the Department of Corporations; (3) failing to comply with conditions or orders of the Department of Corporations relating to the securities/advertisements at issue (*People v. Keating* (1993) 21 Cal.App.4th 145, 152 [25 Cal.Rptr.2d 810]; § 25302); or (4) using deceptive or otherwise prohibited practices in connection with the offer or sale of securities in California, regardless of whether qualification is required (§§ 25400–25404, 25541; *People v. Smith* (1989) 215 Cal.App.3d 230, 236–237 [263 Cal.Rptr. 684]).

Defendant was convicted of 240 counts of offering or selling an unqualified security under section 25110, which provides in relevant part: "It is

---

[2] " 'Qualification' is the process by which an issuer seeks authority to sell and issue its securities in California. The procedure is roughly similar to the *registration* procedure under the federal securities law . . . . But the concept is different in that the federal registration requirements are designed simply to compel *disclosure* of all material facts. Qualification, on the other hand, is more paternalistic. It requires obtaining authority from a state officer (Corporations Commissioner) for the securities transaction based on standards of fairness—i.e., a review on the merits." (Friedman et al., Cal. Practice Guide: Corporations (The Rutter Group 2012) ¶ 5:196, p. 5-92 (rev. # 1, 2012).)

unlawful for any person to offer or sell in this state any security in an issuer transaction . . . unless such sale has been qualified under [the Corporations Code] or unless such security or transaction is exempted or not subject to qualification [under the Corporations Code]." It is undisputed defendant did not seek or obtain permission from the Department of Corporations to sell the securities at issue by any of the means by which securities may be qualified for sale in California. (See §§ 25111–25113.) Defendant does not contend on appeal that the securities or transactions at issue were exempt from qualification requirements. (See §§ 25100–25105.) The only claim raised by defendant with regard to his section 25110 convictions is that the jury was improperly instructed with regard to the mens rea requirement of this crime. Defendant asserts the jury was required to find as an element of the offense that defendant knew (or should have known) the promissory notes at issue were securities.

Defendant was convicted of 288 counts of fraud in the offer or sale of a security. (§ 25401 ["It is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."].) Defendant asserts a variety of instructional errors occurred in connection with these convictions, and advances a sufficiency of the evidence challenge to many of these convictions.

Defendant was also convicted of four counts of engaging in a fraudulent securities scheme. (§ 25541 ["Any person who willfully employs, directly or indirectly, any device, scheme, or artifice to defraud in connection with the offer, purchase, or sale of any security or willfully engages, directly or indirectly, in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the offer, purchase, or sale of any security shall upon conviction" be fined or imprisoned].) Defendant does not contend any specific error occurred with regard to his section 25541 convictions. Nor does defendant assign error with regard to his false tax return convictions. We now turn to defendant's specific contentions.

*Instruction with Regard to Defendant's Knowledge That Notes Were Securities*

██ Defendant claims the court committed error by failing to instruct the jury that it was required to find defendant *knew or should have known* the notes were securities as an element of the crime of selling unqualified

securities (§ 25110).[3] Defendant did not object to the pertinent instructions at trial or propose an instruction like that argued for on appeal. But "[t]he appellate court may . . . review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Pen. Code, § 1259.) " 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 996 [125 Cal.Rptr.3d 408, 252 P.3d 968].) The court's duty extends to defenses supported by substantial evidence (*id.* at p. 996), a principle which is pertinent here because the Attorney General contends defendant's alleged lack of knowledge that the notes were securities is at most an affirmative defense, not an element of the crime.

The court instructed the jury that the elements of the crime were: "1. That a security was offered or sold in this state in an issuer transaction; [¶] 2. That such conduct was willful; and [¶] 3. That at the time the security was offered or sold, such offer or sale had not been qualified with the Commissioner of Corporations of the State of California." The jury was also instructed: "In the crime of offering or selling a security that has not been qualified or exempted in violation of . . . section 25110, only a general intent need be shown. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent even though he may not know that his or her act or conduct is unlawful. The People do not have to prove that the defendant knew that the investment offered was a security."

In *People v. Salas* (2006) 37 Cal.4th 967 [38 Cal.Rptr.3d 624, 127 P.3d 40] (*Salas*), our Supreme Court held "that a seller who believes reasonably and in good faith that a security is exempt is not guilty of the crime of unlawful sale of an unregistered security." (*Id.* at p. 971.) *Salas* rejected the notion that section 25110 is a strict liability offense. (*Salas*, at p. 975.) Section 25540, subdivision (a), authorizes criminal liability for violations of section 25110 only when such violations are committed " 'willfully.' " (*Salas, supra*, 37 Cal.4th at p. 975.) Following precedent (*Simon, supra*, 9 Cal.4th 493), the *Salas* court reemphasized that " 'willful[ness]' " in the criminal securities case context consists of "guilty knowledge," not just intent to do the proscribed act. (*Salas, supra*, 37 Cal.4th at pp. 975–981.)

The *Salas* court also held "a defendant's reasonable good faith belief that a security is exempt from registration is an affirmative defense on which the defense bears the initial burden of proof." (*Salas, supra*, 37 Cal.4th at

---

[3] As noted above, defendant implicitly concedes for purposes of appeal that the notes at issue were nonexempt securities that were required to be qualified with the Department of Corporations.

p. 971.) The court reasoned that the underlying burden of proving an exemption " 'is upon the person claiming it' " and that evidence of a defendant's good faith belief of exemption was peculiarly within the defendant's control. (*Id.* at pp. 981–982.) Thus, disproving a defendant's reasonable good faith belief in an exemption is not an element of the crime. But the defendant's burden is only to raise a reasonable doubt of his guilt, not to prove the affirmative defense by a preponderance of the evidence. (*Ibid.*) It was error for the trial court in *Salas* to instruct the jury that " 'evidence that a defendant . . . acted in good faith is not a defense.' " (*Id.* at pp. 974, 983 & fn. 8.)[4]

The *Salas* court noted it was not presented with the issue raised by defendant in the instant case: "The mental aspect of a violation of section 25110 could refer to whether a defendant knew the thing sold was a security, whether he knew it was unregistered, or whether he knew it was not exempt from registration. Only the third aspect is at issue here." (*Salas, supra*, 37 Cal.4th at p. 971, fn. 2.) Was *Salas* merely demarcating the reach of its holding, or did it implicitly signal in this footnote that a defendant must have guilty knowledge that the financial product at issue is a security? If the latter, would defendant have an affirmative defense or would defendant's knowledge be an element of the offense, as (unlike exemptions to qualification) it is the prosecutor's burden to prove that a security was offered? (Cf. *Simon, supra*, 9 Cal.4th at p. 522 [knowledge that statements are false or that omissions are material is element of § 25401 offense].) And going deeper down the rabbit hole, does it then follow that every alleged criminal securities offense requires the prosecutor to prove as an element of the offense that the defendant knew or should have known that the product offered or sold was a security?

Two subsequent appellate cases declined to hold that a defendant's knowledge of whether an investment contract is a security is an element of a securities offense. In the context of a section 25110 claim, an appellate court held that "a reasonable good faith belief that [defendants] were not selling securities" can be an affirmative defense in the same manner as a reasonable good faith belief that "securities were exempt from qualification." (*Frederick, supra*, 142 Cal.App.4th at pp. 416–417.) But knowledge is not an element of the offense because "knowledge or lack of knowledge . . . is peculiarly within [defendants'] personal knowledge." (*Id.* at p. 417.) The *Frederick* trial court did not commit instructional error by not providing for such a defense

---

[4] Following *Salas*, the court in this case instructed the jury as follows: "A defendant is not guilty of the crime of selling an unqualified security . . . unless the defendant knew the security was not exempt or was criminally negligent in failing to know the security was not exempt. [¶] In raising this defense, the defendant bears the burden of offering substantial evidence that, if believed by the jury, would raise a reasonable doubt as to the defendant's knowledge or criminal negligence."

because the defendants had not met their evidentiary burden to introduce substantial evidence that they had a good faith, reasonable belief they were not selling securities. (*Ibid.*)

A court came to a similar result in a case involving section 25210, which prohibits broker-dealers from selling securities in California without a license. (*Cole, supra*, 156 Cal.App.4th at pp. 478–479.) Applying *Salas*, *Cole* held that a nonlicensed broker-dealer can present an affirmative defense that he or she had "a reasonable and good faith belief that he or she is exempt from the licensing requirement of section 25210, and/or a reasonable and good faith belief that he or she is excluded from the statutory definition of broker-dealer." (*Cole, supra*, 156 Cal.App.4th at p. 477.) *Cole* also held: "section 25210 is a general intent crime. Knowledge that an investment is a security (and therefore requires a broker-dealer license) is not an element of criminal violations of section 25210." (*Cole, supra*, 156 Cal.App.4th at p. 478.) *Cole* does not explicitly answer whether a reasonable, good faith belief that an investment contract is not a security is an affirmative defense.

█ In view of these subsequent cases and our reading of *Salas, supra*, 37 Cal.4th 967, we conclude that proving defendant knew he was selling a security is not an element of section 25110 or any other securities offense. The *most* that can be said is that lack of knowledge that one is dealing in a security is an affirmative defense to section 25110. (*Frederick, supra*, 142 Cal.App.4th at p. 417.) We therefore reject defendant's contention on appeal.[5]

Although not made an issue by defendant in this appeal (perhaps because defendant was repeatedly told by attorneys that the notes were securities), we note that it is debatable whether *Salas, supra*, 37 Cal.4th 967, intended to allow defendants to pursue an affirmative defense to section 25110 charges by claiming they did not know they were selling securities. A reasonable distinction might be posited between not knowing a security is at issue and not knowing an exemption does not apply. The affirmative defense recognized in *Salas, supra*, 37 Cal.4th 967, is a defense available only upon presentation of evidence suggesting a good faith error made by a reasonable person (perhaps in consultation with counsel) about whether the factual circumstances were such as to allow an exemption. (*Id.* at pp. 982–984 [instruction should not be provided if there is no evidence those asserting exemption actually investigated law and facts in good faith, and error is

---

[5] Other jurisdictions are in accord. (See, e.g., *U.S. v. Brown* (9th Cir. 1978) 578 F.2d 1280, 1284 ["The government need only prove that the object sold or offered is, in fact, a security; it need not be proved that the defendant had specific knowledge that the object sold or offered was a security."]; *People v. Pahl* (Colo.App. 2006) 169 P.3d 169, 185 ["Requiring proof of a defendant's awareness that an instrument is a security would undermine the statute's purpose, because the definition of security is intended to be flexible."].)

harmless if evidence is clear there was no good faith misunderstanding].) The *Salas* defense is not based on actual or feigned ignorance of the law. (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 396–397 [128 Cal.Rptr.3d 611, 257 P.3d 41] ["A defendant may not escape criminal liability by asserting that he did not know the criminal law."].) A defendant who claims not to know his investment contracts were securities is usually testifying to his own ignorance of the law (e.g., "I don't know what a security is!"), rather than a reasonable, good faith mistake at odds with the jury's factual finding that the product offered was a security. This is because the definition of a security is broad and flexible, suggesting that a good faith, reasonable appraisal of an investment product will err on the side of classifying such products as securities. In sum, even if an affirmative defense is theoretically available to defendants on this point, it will be the rare case in which it is appropriate to provide such instruction.

*Sufficiency of Evidence with Regard to Section 25401, Misleading Omissions to Investors*

Defendant asserts many of his convictions (mostly under § 25401) are not supported by substantial evidence. It is undisputed that each section 25401 conviction at issue is supported by evidence of a separate note promising the payment of interest and the return of principal. Defendant claims there is insufficient evidence to support findings of guilt with regard to misrepresentations or omissions made to many of the victims. The parties' briefs carefully analyze the state of the evidence with regard to communications made to each of the victims. The bottom line is that some of the elderly victims were either dead at the time of trial or could not remember what, if anything, was communicated to them about the promissory notes they received in exchange for their money. Other victims testified to varying degrees that they were told about the promised return of 12 percent and were not told any of the negative facts about defendant and his business operations or provided any written information about the risks of the investments and defendant's past. And still other victims remember being told their investments were safe, but not being told any of the negative information about defendant or the investments. In some of the transactions, new notes were substituted for old notes without any additional communication by defendant or his agents. Defendant is challenging convictions based mostly on the existence of the notes, without evidence from the corresponding victim that specific misrepresentations of existing fact or omissions were made in connection with the existence of the note.

Defendant himself testified about some of the things he *did not* tell investors (e.g., defendant was taking a 10 percent commission off the top, investors were sometimes paid interest payments out of other investments

rather than out of business revenues, defendant had been involved in prior failed ventures that used the same promissory note financing model, defendant had previously declared bankruptcy, defendant's insurance license was revoked, defendant was not licensed as a broker-dealer or investment adviser). But this is an appeal of the court's denial of his motion to dismiss pursuant to Penal Code section 1118.1 (after the prosecutor's case-in-chief), in which defendant argued that with regard to charges on which no evidence was offered pertaining to representations made or not made in connection with the sale of the promissory notes, there was insufficient evidence to sustain a conviction. Thus, as we are independently reviewing the court's denial of defendant's motion under the substantial evidence standard as applied to the state of the evidence at the time of the motion, we may not consider defendant's testimony. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1212–1213 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

There are actually two questions presented. One is the substantial evidence question: is there enough evidence that material misleading omissions were made to each victim to sustain each of defendant's convictions? But there is an antecedent question of statutory interpretation: when are material omissions cognizable under section 25401?

As to this question of statutory interpretation, defendant points to the text of the statute. "Section 25401 only applies to an 'untrue statement of material fact' or an omission to state a 'material fact *in order to make the statements made*, in light of the circumstances under which they are made, *not misleading.*' (Italics added.) Section 25401 does not apply to simple nondisclosure." (*Bowden v. Robinson* (1977) 67 Cal.App.3d 705, 717 [136 Cal.Rptr. 871]; see *Tse v. Ventana Medical Systems, Inc.* (3d Cir. 2002) 297 F.3d 210, 225.) Defendant argues he is being punished for "simple nondisclosure" for any count in which the state of the evidence is that he did not make any communications to the alleged victims other than the promises contained in the securities (i.e., the promise to pay 12 percent interest and return principal at the end of one year). According to defendant, he made no statement of material fact. Therefore, additional disclosures were not needed.[6]

---

[6] To be sure, had defendant actually sought to qualify his securities with the Department of Corporations, he would have been required to disclose most if not all of the information alleged by the prosecutor in this case to have been misleadingly omitted. (See § 25113, subd. (b)(1); Cal. Code Regs., tit. 10, §§ 260.110, 260.112 [requires description of business, proposed use for proceeds of securities, remuneration of directors and officers, calculation of proof of ability to meet proposed dividend payments], 260.113.) And it seems likely that defendant never could have qualified the securities had he attempted to do so. (Cal. Code Regs., tit. 10, § 260.140.05, subd. (a) ["An application for an open qualification normally will not be approved if the business . . . is not reasonably anticipated to produce profits within a reasonable period of time."].) But defendant's argument is not that he did nothing wrong, it is that he did not violate section 25401.

The Attorney General, on the other hand, posits defendant omitted "material" facts about his history and the financial precariousness of the businesses in which defendant was offering investments, and that this is sufficient to satisfy section 25401. Under both state and federal securities law, " '[a] fact is material if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision.' " (*Insurance Underwriters Clearing House, Inc. v. Natomas Co.* (1986) 184 Cal.App.3d 1520, 1526 [228 Cal.Rptr. 449] (*Natomas*).) Clearly, applying this test, the jury was entitled to conclude the information not disclosed by defendant was material.

But the question the parties dance around in their briefs is whether a *false promise* to repay an investor in the future can be "*an untrue statement of a material fact*" (or a "misleading" statement of fact) under section 25401.[7] (Italics added.) It is implicit in the Attorney General's view that a schemer should not be able to avoid criminal liability under section 25401 by providing no information other than a promise to provide fantastic returns. By making his promises of 12 percent interest and return of principal, was defendant making either false statements or, under the circumstances, misleading statements? Conversely, is a "Ponzi schemer" innocent of violating section 25401 if he does not make any representations of past or existing fact in extracting "investments"?

Careful parsing of the statutory language supports defendant's argument to some extent. As noted, section 25401 refers to "untrue statement[s] of a material fact" or omissions necessary to make "statements made . . . not misleading." Section 25541 is broader than section 25401, as it deems to be criminal any willful "device, scheme, or artifice to defraud" or any "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the offer, purchase, or sale of any security . . . ." (§ 25541, subd. (a); see § 25006 [" 'Fraud,' 'deceit,' and 'defraud' are not limited to common law fraud or deceit."].) Pursuant to the Civil Code, false representations of fact and false promises are different theories of fraud. Actionable fraud or "deceit" includes both "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true" and "[a] promise, made without any intention of performing it." (Civ. Code, § 1710, subds. 1, 4.) If these statutes are read in pari materia, one might conclude a distinction should be maintained between statements of past or existing fact and promises about the future when interpreting section

---

[7] Put another way, is theft by false pretenses (Pen. Code, §§ 487, 532), when the pretense used is a false promise of future conduct rather than a misstatement of existing fact (*People v. Ashley* (1954) 42 Cal.2d 246, 265 [267 P.2d 271]), also a violation of section 25401 when the theft involves the sale of a security?

25401. If this distinction is maintained, section 25401 would not apply to false or misleading promises whereas section 25541 would apply to false or misleading promises.[8]

Case law, though, hints at a different rule. In *People v. Johnson* (1989) 213 Cal.App.3d 1369 [262 Cal.Rptr. 366] (*Johnson*), the appellate court held a defendant need not have knowledge his statements of material fact are false under section 25401. (*Johnson*, at pp. 1375–1376.) The *Johnson* defendant's statements were false statements "about conduct in the future," to wit, representations he "would not commingle funds from the various partnerships." (*Id.* at p. 1375.) Although not squarely addressed, the implication from *Johnson* is that false promises are actionable under section 25401.

Our Supreme Court subsequently disapproved of *Johnson*, holding there was a knowledge requirement with regard to representations made under section 25401. (*Simon, supra,* 9 Cal.4th at p. 522 ["We conclude therefore that knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in section 25401." (fn. omitted)].) The *Simon* court, however, did not reject the notion of using false promises as "untrue statement[s] of a material fact" under section 25401. In finding instructional error in the case before it, the court observed: "The court also erred in instructing that if a defendant makes a material representation about conduct in the future, he must act in accordance with that representation irrespective of what his intent or knowledge was at the time the representation was made." (*Simon,* at p. 523.) This instruction was in error because "[t]he truth or falsity of a representation and the materiality of an omission must be determined on the basis of what the seller knew or should have known at the time of sale." (*Ibid.*)

Neither *Johnson* nor *Simon* directly took on the question of whether a false or misleading promise is a legitimate basis for a section 25401 conviction. But it seems sensible, notwithstanding the Civil Code distinction between representations of fact and promises, that section 25401 applies to a stark case in which a seller of securities has either no intention or no ability to ever fulfill the promises made in the security to the investor. Defendant's reply brief misleadingly cites *Natomas, supra,* 184 Cal.App.3d at page 1526, for the proposition that a misleading statement under section 25401 must be of " 'a past or existing *material* fact.' " In using the "past or existing *material*

---

[8] But bear in mind, California's long-held theory of promissory fraud is based on the premise that "[a] promise to do something necessarily implies the intention to perform, and where that intention is absent, there is an implied misrepresentation of *fact*," namely, "an existing state of mind." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 781, p. 1131, italics added.)

fact" language, the *Natomas* case was referring to "a common law cause of action for negligent misrepresentation," not a section 25401 action. (*Natomas, supra*, 184 Cal.App.3d at p. 1526.)[9]

Some federal cases, applying the federal Securities and Exchange Commission (SEC) rule 10b-5 (17 C.F.R. § 240.10b-5 (2012)),[10] suggest it is a misrepresentation (*as well as* a fraudulent scheme) to promise outsized investment returns when the actual financial situation makes it clear the investor will never receive his or her principal back, let alone handsome returns. (See, e.g., *Webster v. Omnitrition Internat., Inc.* (9th Cir. 1996) 79 F.3d 776, 785–786 [statements of opinion about returns on pyramid scheme can be misrepresentations and also operate as a " 'fraud or deceit' " upon the investor under rule 10b-5]; *SEC v. Better Life Club of America, Inc.* (D.D.C. 1998) 995 F.Supp. 167, 176–177 ["promise of doubled money was a misrepresentation" because enterprise was "a grand pyramid scheme . . . teetering on the verge of collapse"].)

The case before us is arguably more complicated than a pyramid scheme or pure Ponzi scheme (without any underlying business efforts). The prosecutor did not necessarily pursue a theory that defendant's *promises were false*, i.e., he (and the entities through which defendant acted) never had any intention of repaying his investors. This theory of the case conflicts with the messiness of defendant's story, in which attempts to run businesses and thereby repay investors were made. Defendant may well have believed his business ventures would somehow succeed despite all odds and thereafter he would be able to repay all the investors. Rather, the theory of the prosecution's case was defendant's promises to pay his investors were *misleading* in light of material omissions by defendant pertaining to the likelihood of repayment. Defendant's subjective belief about whether he could repay his investors was

---

[9] In *People v. Smith, supra*, 215 Cal.App.3d 230, a jury convicted defendant Smith of multiple counts of theft and securities fraud as a result of a real estate scheme perpetrated upon a small number of investors. One question raised on appeal was whether the trial court had correctly dismissed two counts of securities fraud (§ 25401) that were based on the defendant's failure to disclose the allegedly " 'material fact' " that he had previously been convicted of grand theft in 1973. (*Smith*, at p. 238.) The appellate court affirmed, finding merit in the argument that Smith's prior conviction had been reduced to a misdemeanor at sentencing and had subsequently been dismissed under Penal Code section 1203.4 after Smith completed his probation. (*Smith*, at pp. 238–239 ["Smith cannot be prosecuted for failing to voluntarily disclose this misdemeanor conviction."].) This case is of limited value to our analysis because of the unique factual context. The *Smith* court avoided the broader issue of how section 25401 should be interpreted with regard to material omissions and instead focused on Penal Code provisions relating to the legal effect of prior convictions.

[10] Section 25401 "is essentially identical to clause (b) of rule 10b-5 . . . ." (*Lynch v. Cook* (1983) 148 Cal.App.3d 1072, 1087 [196 Cal.Rptr. 544], disapproved on other grounds in *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1137–1138 [275 Cal.Rptr. 797, 800 P.2d 1227].)

irrelevant under the prosecution's theory. Defendant's violation of section 25401 was providing outrageously unrealistic promises to unsophisticated investors without providing the investors with the material facts necessary for them to understand defendant's promises could not realistically be fulfilled.

We agree with the Attorney General's interpretation of section 25401. In cases involving pyramid schemes or Ponzi schemes in which unsophisticated investors' money is being used to pay off interest owed to other investors and money is being siphoned off to enrich principals before the underlying business is profitable, promises to investors to pay interest and return principal are inherently either false or misleading. Here, defendant's promises to repay principal and interest on promissory notes were misleading in the absence of disclosures about the nature of his business enterprises and his prior history of fleecing elderly investors.

There is certainly substantial evidence, as evidenced by the promissory notes admitted into evidence, that defendant promised to pay investors 12 percent interest and return their principal. Even assuming the evidence is insufficient for the jury to conclude that these were "false promises," a point that is debatable, there is substantial evidence in the prosecution's case-in-chief that defendant did not make sufficient disclosures to the victims to make his statements not misleading. The testimony of victims who recall the communications (and lack thereof) that were received from defendant and his colleagues, along with the consistent absence of any written disclosures in the files of defendant or any of the victims, is substantial evidence that defendant consistently omitted material facts to all victims, not just those fortunate enough to have survived to testify against defendant.

With regard to several of the victims, defendant contends there was no evidence that *any* crime occurred (securities fraud, sale of unqualified security, or theft from an elder). Based on our analysis above, however, we reject this argument. Substantial evidence was presented that defendant sold notes to these victims based on the introduction of the notes themselves and all the other evidence in the record from other victims and witnesses suggesting that defendant actually was selling these unqualified, misleading securities in exchange for money.

*Lack of Instruction That Section 25401 Offenses Required Knowledge of Materiality*

Next, defendant asserts the court erred with regard to its failure to instruct the jury that it needed to find defendant knew his omissions were material. The "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and

discover them, are elements of the criminal offense described in section 25401." (*Simon, supra*, 9 Cal.4th at p. 522.) While the pertinent instruction required the jury to find defendant had knowledge of the falsity of his statements or misleading nature of his omissions, the instruction did not explicitly require the jury to find that defendant knew his statements/omissions were "material."

Defendant did not object to this instruction at trial, but contends the error affected his substantial rights. The Attorney General concedes instructional error occurred, but contends the error was harmless. We agree any error was harmless under any standard of review. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 320 [109 Cal.Rptr.2d 851, 27 P.3d 739]; *Simon, supra*, 9 Cal.4th at p. 523.) It is impossible to believe that the jury would have found defendant did not know his omissions were material at the same time it found beyond a reasonable doubt that defendant knew he made misleading omissions. There is overwhelming evidence establishing that the supposed safe investments marketed by defendant to elderly, unsophisticated investors were extremely risky at best (and Ponzi schemes at worst). Defendant withheld obviously material information that would have allowed his investors to see they should not trust defendant by placing their assets at risk.

*Lack of Unanimity Instruction for Section 25401 Offenses*

Defendant also contends the court erred by not (sua sponte) providing a unanimity instruction with regard to his section 25401 offenses. Defendant reasons that the prosecutor highlighted a large number of omissions made by defendant. Potentially, the jury could have convicted defendant without coming to an agreement as to which omissions were material.

" 'It is fundamental that a criminal conviction requires a unanimous jury verdict [citations].' [Citation.] What is required is that the jurors unanimously agree defendant is criminally responsible for '*one discrete criminal event*.' [Citation.] '[W]hen the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed in the words of [CALCRIM No. 3500] or their equivalent that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act.' " (*People v. Thompson* (1995) 36 Cal.App.4th 843, 850 [42 Cal.Rptr.2d 798].) Trial courts have a sua sponte duty to provide a unanimity instruction when appropriate. (*People v. Crawford* (1982) 131 Cal.App.3d 591, 596 [182 Cal.Rptr. 536].)

In *People v. Russo* (2001) 25 Cal.4th 1124 [108 Cal.Rptr.2d 436, 25 P.3d 641], our Supreme Court held that jury unanimity is not required on the

specific theory of guilt or particular method of commission of the crime. "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. . . . In deciding whether to give the [unanimity] instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at pp. 1134–1135.) When the evidence "shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Id.* at p. 1132.)

Here, the court did not err in failing to provide a unanimity instruction. Each of the section 25401 counts at issue on appeal alleged defendant sold one security on a specific date to a single victim. The jurors were not required to agree on the particular misrepresentations or omissions they relied on for the convictions because that finding merely relates to the manner of committing the crime.

*Admission of Prejudicial Evidence*

Defendant also claims the court committed prejudicial error by admitting evidence at trial addressing (1) funds set aside to bribe officials in Grenada; (2) defendant's prior business ventures ending in bankruptcy; and (3) the revocation of defendant's insurance license. Defendant claims this evidence was either irrelevant under Evidence Code section 350, unduly prejudicial under Evidence Code section 352, or inadmissible character evidence pursuant to Evidence Code section 1101. Defendant preserved his objections to these categories of evidence at trial.

We review evidentiary rulings for an abuse of discretion. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 [117 Cal.Rptr.3d 658, 242 P.3d 105].) " ' "[A] trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Id.* at pp. 1328–1329.)

█ " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in

reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) In cases involving uncharged misconduct, "[t]he probative value of the uncharged offense evidence must be substantial . . . ." (*People v. Kipp* (1998) 18 Cal.4th 349, 371 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

Despite its relevance, "evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion," is inadmissible. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 [27 Cal.Rptr.2d 646, 867 P.2d 757], superseded on other grounds by Evid. Code, § 1108; see Evid. Code, § 1101, subd. (a).) But "[n]othing . . . prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

The court did not abuse its discretion in admitting any of this evidence. Evidence suggesting defendant bribed Grenadian officials and deducted the $6,000 as a business expense, if believed by the jury, supported the allegation that defendant filed a false tax return, a charged offense. Evidence suggesting defendant lost investor money in a prior investment scheme was necessary to allow the prosecutor to argue defendant should have disclosed this prior failure to his investors. Similarly, proof that defendant's insurance license was revoked because defendant did not disclose the fees he was receiving in connection with the sales of annuities was necessary to allow the prosecutor to argue defendant should have disclosed this fact to his investors. And the latter two categories of evidence also provide evidence of defendant's intent to defraud his investors, in that they show he should have been aware of his need to be honest with investors about the risks of his offered investments and the monetary enrichment defendant himself was obtaining from such investments. (See *State v. Brewer* (Tenn.Ct.App. 1996) 932 S.W.2d 1, 22–25 [no error to admit evidence of prior fraudulent schemes, bankruptcies, and civil injunctions in criminal securities case].)

*Denial of New Trial Based on Newly Discovered Evidence*

After the conclusion of the trial, defendant discovered the SEC had filed a complaint against MCC and its principals. Defendant moved for a new trial

based on the argument that the prosecution had faulted defendant for moving his investors out of MCC investments and into GNP. MCC was allegedly "operating a classic Ponzi-like scheme" by using a variety of entities to purchase receivables from other related entities, thereby providing cash to pay off previous investors.

The court did not abuse its discretion. (*People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) It is not probable a different result would occur on retrial. Indeed, it is preposterous to think the jury would somehow find defendant's behavior not criminal because it turned out that yet another business to which he directed investors was allegedly conducting a Ponzi scheme.

*Admission of False Testimony*

Relatedly, defendant contends the testimony of MCC executives at trial was false and defendant's right to due process was violated thereby. " 'Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted.' " (*People v. Avila* (2009) 46 Cal.4th 680, 711 [94 Cal.Rptr.3d 699, 208 P.3d 634].) But there is no evidence in the record that the prosecutor knew about the SEC investigation or about any alleged falsity of the testimony of the MCC executives. There was no violation of defendant's due process.

*Alleged Juror Misconduct*

Defendant's wife, Peggy Butler, was tried alongside defendant for filing false tax returns. The jury trial lasted almost eight months. After the jury returned its verdict, Peggy moved for a new trial based on alleged juror misconduct; defendant joined in the motion. According to evidence presented in the new trial motion, the jury foreperson was present at two 2007 church trips to Mexico and certain hair salon appointments during times in which friends of the Butlers talked about the case against defendant and Peggy (e.g., requests to pray for the Butlers, sympathy expressed for the Butlers' legal situation). The motion alleged the juror committed misconduct by not disclosing her alleged knowledge of the case and her alleged familiarity from the church trip with one potential witness in the case who was listed with 273 other witnesses.

The court denied the motion, in part because there was no showing Peggy and defendant did not know about this alleged misconduct prior to the rendering of the jury verdict. In response to the court's question to defense

counsel about such knowledge, defense counsel refused to answer the court's question on the grounds of the attorney-client privilege. " 'It is . . . the controlling law of this state that even where affidavits can properly be received to impeach the verdict of a jury they must be accompanied by an affirmative showing that neither the moving party nor his counsel had knowledge of the misconduct relied on prior to the rendition of the verdict. The absence of such a showing in support of the motion for new trial is fatal.' " (*People v. Black* (1963) 216 Cal.App.2d 103, 115 [30 Cal.Rptr. 798]; see *People v. Sanchez* (1965) 232 Cal.App.2d 812, 819 [43 Cal.Rptr. 131].) This rule is particularly sensible under the facts of this case. If the allegations in the motion for new trial are accurate, it is plausible Peggy and defendant knew about the juror's alleged link to their friends and withheld this information in the hope the juror would be sympathetic to them based on mutual social acquaintances. The court properly denied the new trial motion on this basis.

*Alleged Error Pertaining to Multiple Counts of Theft from an Elder for Same Victims*

Finally, defendant claims the court erred under *People v. Bailey* (1961) 55 Cal.2d 514 [11 Cal.Rptr. 543, 360 P.2d 39] (*Bailey*), a case describing how it should be decided whether a defendant has committed one theft or multiple acts of theft with regard to a single victim. "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Id.* at p. 519.) Defendant argues the evidence supports only one count of theft from an elder (Pen. Code, § 368, subd. (d)) per single investment of money by a victim, and that 68 of his convictions of theft from an elder should therefore be reversed because they were based on mere renewal of a promissory note without new money invested.

We review the judgment under the deferential substantial evidence standard: "The *Bailey* doctrine applies as a matter of law only in the absence of any evidence from which the jury could have reasonably inferred that the defendant acted pursuant to more than one intention, one general impulse, or one plan." (*People v. Jaska* (2011) 194 Cal.App.4th 971, 984 [123 Cal.Rptr.3d 760].) Given this deferential standard of review, we affirm the judgment. Although no new investment money was handed over by the victims in each

of the counts identified by defendant as deficient, defendant took a new commission each time he renewed the notes, thereby enriching himself.[11]

## DISPOSITION

The judgment is affirmed.

Rylaarsdam, Acting P. J., and Bedsworth, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 17, 2013, S208385.

---

[11] As execution of sentence was stayed pursuant to Penal Code section 654 as to every count of elder abuse, there is no practical effect on defendant's sentence regardless of the outcome of this issue.