Filed 12/10/14  P. v. Lemons CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHARLES RAY LEMONS,<br><br>    Defendant and Appellant. | B252215<br><br>(Los Angeles County<br>Super. Ct. No. GA088419) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Carter, Judge.  Affirmed.

Kaye, McLane, Bednarski & Litt, Carlton F. Gunn and Marilyn Bednarski for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Charles Ray Lemons appeals the judgment following his conviction for one count of criminal threats. He raises various claims of error, but we find no error warranting reversal. We affirm.

## PROCEDURAL HISTORY

As charged in the information, appellant was convicted by a jury of a single count of making criminal threats. (Pen. Code, § 422.)[1] He was sentenced to 16 months in state prison and assessed various fines, fees, and credits not at issue here.

## STATEMENT OF FACTS

The threats at issue occurred on the evening of November 21, 2012—the night before Thanksgiving—in a Whole Foods grocery store in Pasadena, California. Julie Guerrero was working as a cashier that evening and recognized appellant as a regular customer. Appellant approached Guerrero's checkout counter and placed his groceries on the conveyer belt. Although Guerrero asked appellant how his day had been and whether he needed a bag, appellant did not respond, although he usually did not speak to her. On the night at issue, he had his head down and appeared to be whispering to himself.

Although customers usually push their carts in front of them so their bags can be placed in the cart, appellant had his cart behind him in line. The victim, Dustin Johnson, was shopping with his mother and got in line behind appellant with both his and appellant's shopping carts between them. He had never met or seen appellant previously. After Guerrero rang up appellant's groceries and put them in a bag, she told him the total amount of his purchase. He took out his wallet and removed some cash, but then appeared to be looking for an ATM (automated teller machine) or credit card to pay. He seemed to become nervous and frustrated, fumbling in his pants pockets apparently for an alternative form of payment. Johnson said nothing to him at that time and simply watched him.

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

Appellant was standing in front of the ATM/payment terminal, but it was a tight space due to the position of his cart, so he may have had problems trying to pay with an ATM or credit card. Appellant suddenly shouted, "Back the fuck up" or "Back off" and pushed his cart into Johnson's, causing Johnson's cart to hit his leg. According to Guerrero, Johnson said nothing to appellant before this. Appellant's conduct so startled Guerrero that she took a couple of steps back, picked up the store intercom phone, and called for security, something she had never done before.

Appellant moved within a few inches of Johnson and loudly said something like, "I am not scared of you. What are you going to do? You are not going to do nothing, you are not going to do shit." Johnson stood with his hands at his side, trying to deescalate the situation. Appellant walked away, but then returned to Johnson and engaged in another "tirade," saying to Johnson, "I work with guns, I know what to do with guns, I will put you in the ground." He gestured with his hand like he was shooting a gun. He also told Johnson he would meet him outside in the parking lot. Johnson continued to keep his arms at his side and told him in a low monotone voice to "Get out of my face, you can get out of my face."[2]

During this entire episode, Johnson never touched appellant or raised his voice. Guerrero later told officers that, at some point prior to finishing his transaction, appellant "walked up to Mr. Johnson and said, 'I will shoot you, I will kill you, I will put a bullet in your head, I am not scared.'"

Andres Carranza, a security guard at the store, responded to the register area. As he approached, he saw appellant was irate with an "aggressive posture" and yelling and calling Johnson the "n" word. He heard Johnson ask appellant why he was so irate and say, "I know you are bigger than me and all that and you could whoop my ass and all of

---

**2**     On cross-examination, Guerrero admitted she testified at the preliminary hearing that Johnson started to argue back with appellant, walked toward appellant as appellant approached him, and "they" started saying, "Let's take this outside." She testified her trial testimony was accurate.

3

that but I really don't want to fight you, man."**3** Although Carranza told Johnson to "[c]hill, man" and be quiet, Carranza did not believe Johnson was escalating the situation. In fact, according to both Carranza and Guerrero, Johnson was trying to tell appellant to calm down. In response, appellant said, "Don't tell me to calm down, shut the fuck up, I am trying to pay." Carranza heard appellant continue to loudly tell Johnson in a threatening manner to "keep your mouth quiet" and "shut your fucking mouth, you nigger." By this point, appellant had attracted the attention of other customers and Johnson's mother appeared fearful.

Carranza stepped between the two men. Appellant told Carranza, "Man, I am talking to the motherfucker." Carranza believed appellant was going to harm Johnson, and a manager told Carranza appellant needed to be escorted out of the store. As Carranza attempted to do so, he told appellant to calm down so he would not have to call the police. According to Carranza, appellant then said to Johnson, "If you don't keep your fucking mouth shut, man, we are going to take this outside. Listen, let me tell you something, motherfucker . . . oh, I got something for you." Carranza also heard him say he had a gun and was not afraid to use it. Johnson heard him say, "I will meet you out in the parking lot, we can handle this." Appellant then said to Johnson, "Listen nigger," and Johnson asked why he was using that word. Appellant simulated a gun gesture with his hand and said, "I will be waiting for you outside if you want to take it outside," and, "If you don't shut your fucking mouth, nigger, I am going to fucking take you out. We will take it outside. Keep on running your mouth, nigger, you are going to find out what all of this is about, motherfucker. . . . You know what, I got something for you, I got something for you outside, you know, if you come outside." He threatened Johnson that he was going to "plug" him, which Carranza understood to mean he was going to shoot Johnson. Carranza never saw Johnson become aggressive toward appellant.

---

**3**     Appellant was approximately six feet three inches tall and Johnson was five feet 10 inches tall.

4

Appellant headed toward the store exit while still yelling. Carranza followed him. Johnson stepped up to pay for his items and said to Guerrero, "Wow, what a night it has been for you." At that moment, appellant again walked back to Johnson and Guerrero heard him say, "I am not scared of you. I will kill you. I am not scared of you." Carranza attempted to escort appellant out again, but appellant was not listening. Instead, he stared at Johnson for two minutes, which Carranza viewed as a "pretty scary moment" and a "pretty serious threat." Appellant eventually exited the store, still irate.

Guerrero became so shaken up she did not finish Johnson's transaction. She believed appellant would carry out his threats.

Outside, appellant approached his vehicle, opened the hatchback door, and sat on the bumper. Carranza told him to leave, but he refused. Carranza implored him to leave because he did not want to have to call the police, and appellant responded, "You know what, I am going to stick around here and I am going to kill that motherfucker." Carranza warned him to be careful what he said because he could wind up in prison. Another security guard took down appellant's license plate number, which further angered appellant, and Carranza flagged down a police unit that had arrived at the scene.

Upon his arrival, Pasadena Police Officer Jack Rappuchi saw appellant drive his car toward the patrol car and a parking lot exit. Officer Rappuchi initiated a traffic stop and asked appellant what happened in the store. Appellant seemed puzzled, denied knowing what Officer Rappuchi was talking about, and asked why he was bothering him. He seemed agitated and continued to deny any knowledge of the incident.

Pasadena Police Officer Rai Wotherspoon arrived and retrieved a gun case from the front passenger seat of appellant's car. It was locked but the key was in the lock; there was a .357 Taurus revolver inside. Officer Wotherspoon also recovered a black bag containing "numerous rounds" of ammunition that fit the gun. At Officer Rappuchi's request, appellant exited his car and submitted to a pat-down search to confirm he had no weapons on him.

Before the police arrived, Johnson finished paying for his groceries and he and his mother intended to leave the store, but a security guard stopped them and said, "Sir, you

5

probably don't want to go outside, it seems as if he has a weapon in his car." They waited inside the store and saw the police surround appellant's vehicle in the parking lot.

Johnson testified he feared for his life and believed appellant might actually have a gun with him and shoot him outside the store. He remained afraid at the time of trial and was concerned about testifying because he had learned appellant was a gun owner and assumed defense counsel told appellant where he lived.

Appellant testified in his defense. He explained he went to the store to buy groceries and as he was checking out, he positioned his cart behind him in the line. He did not have enough cash to pay for his purchases, so he needed to use his ATM card. He claimed Johnson said, "What is your problem? You don't have any money? You don't have enough money?" Because appellant's cart was blocking the ATM reader, appellant moved his cart back to the left to use it. He denied slamming his cart back at that moment and claimed Johnson pushed his cart at appellant. In response, appellant pushed his cart back at Johnson and told him to back off. Johnson then said, "It is not my problem you don't have any money to pay for your food." Appellant warned Johnson, "If you don't back off I don't think you are going to like the way this is going to go." According to appellant, Johnson clenched his fists with his hands out and said, "I don't see you swinging." Appellant believed he was "getting ready to be [in] a fist fight." Appellant responded, "Everybody in this nation is not going to run from you." He claimed Johnson grabbed his arm, to which he responded, "[Y]ou don't touch me." He was loud because he wanted to make sure Johnson understood he was not going to back away. He told Johnson he was not afraid of him and was not going to run from him. He denied calling Johnson the "n" word or that he threatened to shoot or kill him. However, he admitted that, when he saw Johnson's balled fists and had already told him multiple times to back away, he told Johnson, "If you don't back off me, I will put a bullet in you." When asked if he thought Johnson was being aggressive toward him, he testified Johnson was being a "jackass." He also found Johnson's conduct "very, very offensive."

According to appellant, as he finished his transaction, Johnson again said, "It is not my problem you don't have no money. It is not my problem you can't pay for your

6

groceries." As he pulled away in his car, the police stopped him. Appellant testified he owned the unloaded gun locked in the case in his car and it was registered to him.

## DISCUSSION

### 1. *Sua Sponte Self-defense Instruction*

Appellant argues the trial court erred in failing to give a sua sponte instruction on self-defense. "It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]." (*People v. Salas* (2006) 37 Cal.4th 967, 982 (*Salas*).) Appellant contends that, although self-defense is traditionally a defense to crimes of assault or other physical attacks by a defendant, the defense should equally be available to a defendant who is accused of making criminal threats in violation of section 422. Neither party has cited any case that has allowed the use of *threats*—rather than physical force—as the basis for self-defense.

Even if self-defense is a viable defense in a prosecution for violating section 422 (a point we do not address), we conclude there was no substantial evidence that would support the instruction here. "For self-defense, the defendant must actually and reasonably believe in the need to defend, the belief must be objectively reasonable, and the fear must be of imminent danger to life or great bodily injury." (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1426 (*Lee*).) Here there was no evidence that appellant was in actual or reasonable fear of danger, given appellant indicated more than once he was not afraid of Johnson and was "not going to run from" him. When asked if he thought Johnson was being aggressive toward him, he said only that Johnson was being a "jackass." While appellant believed the situation was "getting ready to be a fist fight or whatever," Johnson's balled fists and his comment, "I don't see you swinging," at most suggested Johnson was ready to defend *himself* and did not suggest he was about to attack or strike appellant. Even when Johnson grabbed appellant's arm, appellant did not claim he did so in a threatening manner.

7

The trial court's not giving of the instruction was also harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24, because appellant's version of events was overwhelmingly refuted by every other percipient witness, including two disinterested witnesses, as well as the circumstantial evidence against him. Reversal is not warranted.

### 2. *Sua Sponte Clarification of Criminal Threat Instruction*

Appellant contends the trial court failed to sua sponte clarify the instruction on the elements of criminal threats in CALCRIM No. 1300 to define the meaning of "unconditional." Consistent with CALCRIM No. 1300, the jury was instructed a threat under section 422 must be "so clear, immediate, *unconditional* and specific that it communicated to Dustin Johnson a serious intention and the immediate prospect that the threat would be carried out" and "in deciding whether a threat was sufficiently clear, immediate, *unconditional* or specific," the jury should "consider the words themselves as well as the surrounding circumstances." (Italics added.) The instruction tracked section 422, subdivision (a), which states, "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, *unconditional*, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (Italics added.)

Appellant cites *People v. Bolin* (1998) 18 Cal.4th 297, in which our Supreme Court held section 422 "does not require an unconditional threat of death or great bodily injury." (*Bolin*, at p. 338.) Instead, "[t]his provision 'implies that there are different degrees of unconditionality. A threat which may appear conditional on its face can be unconditional under the circumstances. . . . [¶] Language creating an apparent condition

8

cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat. A seemingly conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of execution.'" (*Id.* at p. 340.) Appellant contends the trial court should have sua sponte given a clarifying instruction based on *Bolin* along the lines of, "A conditional threat is sufficient only if the defendant has no right to impose the condition, the condition is illusory, or the condition is highly likely to occur."

Appellant forfeited this argument by not requesting a clarifying instruction in the trial court. "The long-standing general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellant claim of error based upon the instructions given." (*People v. Rundle* (2008) 43 Cal.4th 76, 151, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The instruction given to the jury accurately set forth the elements of section 422, so appellant was required to request clarification of the term "unconditional" in the trial court if he wanted it to be given to the jury. (*Rundle*, at p. 151 [finding defendant's failure to request the trial court to further define statutory element of crime forfeited claim on appeal].) Because he did not do so, his claim is forfeited.

### 3. *Sua Sponte Unanimity Instruction*

Appellant argues the trial court erred in failing to sua sponte give a unanimity instruction like CALCRIM No. 3500, which states in relevant part: "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed." We disagree.

Appellant contends the evidence demonstrated three distinct threats, each of which the jury could have found violated section 422. According to appellant, the first threat occurred while appellant and Johnson were standing at the register before appellant walked away the first time and before Carranza arrived because Guerrero testified she told Officer Rappuchi that, prior to appellant finishing his transaction at the register, he

9

walked up to Johnson and said, "I will shoot you, I will kill you, I will put a bullet in your head, I am not scared." Appellant claims he made his single admitted threat during this time as well. The second threat occurred when, according to Johnson, appellant walked away from the register the first time and returned to Johnson, telling him, "I work with guns, I know what to do with guns, I will put you in the ground" and gesturing with his hand like he was shooting a gun. The third threat occurred as Carranza was ushering appellant to the exit, at which point appellant walked back toward Johnson and Guerrero heard him say, "I am not scared of you. I will kill you. I am not scared of you."

"""It is fundamental that a criminal conviction requires a unanimous jury verdict [citations]." [Citation.] What is required is that the jurors unanimously agree defendant is criminally responsible for "*one discrete criminal event.*" [Citation.] "[W]hen the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed in the words of [CALCRIM No. 3500] or their equivalent that it must unanimously agree beyond a reasonable doubt that the defendant committed the same specific criminal act."' [Citation.] Trial courts have a sua sponte duty to provide a unanimity instruction when appropriate. [Citation.]

". . .'The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a "particular crime" [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. . . . In deciding whether to give the [unanimity] instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction.' [Citation.] When the evidence 'shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the

10

cases often put it, the "theory" whereby the defendant is guilty.'" (*People v. Butler* (2012) 212 Cal.App.4th 404, 425-426 (*Butler*).)

Here, no unanimity instruction was required because there was no reasonable possibility the jury would have divided to convict appellant of more than one discrete crime. Whether the jury credited the prosecution's evidence that appellant made a series of statements or appellant's testimony he made only one threat, there is no question all the threats were "so closely connected as to form part of one transaction. [Citations.] The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.) Appellant directed either one or several similar statements toward the same victim during a single heated confrontation that took place over the course of five minutes. (See *People v. Dieguez* (2001) 89 Cal.App.4th 266, 275-276 [multiple "successive, compounding, and interrelated" false statements to worker's compensation doctor during single visit aimed at getting worker's compensation benefits constituted continuous course of conduct]; see also *People v. Percelle* (2005) 126 Cal.App.4th 164, 182 [two attempts to use same counterfeit access card to purchase 60 cartons of cigarettes constituted continuous course of conduct, even though defendant left store after first attempt and returned a little over an hour later for second attempt].)[4] Notwithstanding appellant's argument to the contrary, he offered a two-tiered defense at trial that applied equally to all of those

---

[4]     Appellant relies on *People v. Salvato* (1991) 234 Cal.App.3d 872, but there the court recognized the "'continuous conduct'" exception arises in two contexts: "'[t]he first is when the acts are so closely connected that they form part of one and the same transaction . . . . [Citation.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time.'" (*Id.* at p. 882.) The court addressed only the second context and found the language of section 422 did not contemplate a continuing course of conduct. (*Salvato*, at pp. 882-883.) The court did not analyze the first context, which undoubtedly would not have applied to the series of threats in that case that occurred over several months. (*Id.* at p. 884.) Here, the first context was satisfied because appellant's threats were so close in time and so similar they formed the same transaction.

11

statements:  he urged the jury to reject the prosecution's version of events and to find his single admitted threat was conditioned on Johnson backing off.

The parties' differing versions of the confrontation merely raised "'the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime.'" (*Butler, supra*, 212 Cal.App.4th at p. 426.)  There was no question appellant threatened Johnson; the only question was whether he did so through a series of statements according to the prosecution's witnesses or through the single threat he admitted making.  In either situation, only one discrete crime was committed.  Thus, no unanimity instruction was required.

## 4.  Evidentiary Claims

Appellant claims the trial court prejudicially erred in admitting evidence that officers found a gun in his car and in allowing Johnson to testify he was a "behaviorist" who worked with special needs children.  We review the admission of evidence for abuse of discretion (*People v. Waidla* (2000) 22 Cal.4th 690, 717) and find no such abuse here.

### A.  Gun Evidence

Appellant moved in limine to exclude the gun and ammunition officers found in his car on the grounds the evidence was irrelevant and unduly prejudicial.  At a pretrial hearing, the court's primary concern was the absence of undue prejudice because the prosecution was already going to introduce evidence appellant said, "I am a gun owner, I work with guns."  The court denied the motion, reasoning the gun was probative that appellant willfully threatened that he was going to shoot Johnson.  Its admission was not unduly prejudicial because "[w]e are just not going to be able to get around the fact that the jury is going to find out that [appellant] is a gun owner, and so if there is a juror on the jury, or in the voir dire, we find out that a juror believes that if you own a gun you are automatically a violent person, then that person won't be qualified to sit on this particular case because we need jurors who can look at it and say even though you are a gun owner it doesn't necessarily mean that you are a violent person and it is more likely that you committed this crime."  While the situation might have been different if the threat involved a knife, "[h]ere in this case the threat has to do with the facts that the defendant

12

had represented that he had a gun, and I believe that the probative value of that is not substantially outweighed by any undue prejudicial effect and I think it corroborates the defendant's statement." The court excluded evidence that a hundred rounds of ammunition were also found in appellant's car but allowed the prosecution to mention some ammunition was found.[5]

Evidence is relevant if it has any tendency in reason to prove a disputed material fact. (Evid. Code, § 210.) The trial court has wide discretion in determining relevance. (*People v. Clark* (2011) 52 Cal.4th 856, 922.) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in any arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

The trial court properly exercised its discretion in admitting the gun and some ammunition. This evidence was probative to rebut appellant's denials that he made the threats described by the prosecution's witnesses that he was going to shoot and kill Johnson and to demonstrate appellant's intent that his statements be understood as true threats. While the trial court incorrectly predicted there would be evidence that defendant said he *owned* or *had* a gun in his threats to Johnson, Johnson testified that appellant said, "I *work* with guns, I know what to do with guns, I will put you in the ground." (Italics

---

[5] To be precise, at the hearing the trial court allowed the prosecution to mention the gun was "loaded." But Officer Wotherspoon testified "numerous rounds" were found, not that the gun was loaded. And a photograph was introduced showing 10 rounds of ammunition.

13

added.)**6**  Because the jury was going to hear evidence that appellant worked with guns anyway, the prejudicial effect from introducing the gun and ammunition was minimal.

As a result, this case does not fall within the line of authority cited by appellant in which "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons -- a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant."  (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360 [second handgun found in defendant's apartment that he did not use in committing assault on police officers with a firearm was not relevant for any purpose]; see *People v. Stratton* (1988) 205 Cal.App.3d 87, 91-93 [counsel ineffective for failing to object to introduction of knife and hand grenade not used in charged robbery and found on defendant two weeks later]; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392-1393 [knives found in defendant's back yard, bedroom, and other locations almost two years after charged murder were not relevant to show planning or availability of weapons because they had no connection to murder].)

*B.  Johnson's Background*

Johnson testified he was a "behaviorist" who worked with "special needs kids, help them acclimate to their classroom environments."  On direct examination, he testified as appellant was yelling at him, "I am just standing there with my hands at my side.  I am trying to de-escalate his behavior.  I mean, I work with a lot of kids that have mental issues, a lot of the time they . . . ."  Defense counsel interrupted with an unspecified objection and moved to strike his testimony.  The court overruled the objection, reasoning, "[It] [g]oes to his state of mind."  Johnson continued, "I work with people that often get erratic and I didn't want to get erratic when he got in my face

---

**6**     Later, Johnson testified he was still in "sustained fear" at trial, "primarily because [appellant] is a licensed gun owner so I didn't know if he still had access to his weapons, if he was going to come and try to assassinate me at me home."  It is arguable whether this testimony would have been admitted if the gun had been excluded.

14

because I knew that would escalate an already terrible situation in which he was being aggressive and volatile."

On cross-examination, defense counsel asked Johnson if appellant "just shoved his cart back for no reason at all?" Johnson responded, "I think he felt anxiety. He may have some form of anxiety at which he feels more crowded, because I work with a lot of kids and you will be six feet away from them and they will feel crowded, so he may have some type of disorder like that, I don't know." Defense counsel moved to strike his testimony, but the court denied the request, stating, "You asked the question of what the witness thought the defendant was thinking, and so I am going to allow it."

Appellant contends the trial court improperly admitted this testimony because it was improper character evidence. The Attorney General argues this argument was forfeited because appellant did not object on this ground in the trial court and if not forfeited, there was no error. We agree on both counts.

Appellant's unspecified objections and motions to strike did not adequately inform the court of any objection based on improper character evidence, so he forfeited this claim on appeal. (Evid. Code, § 353 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ."]; *People v. Partida* (2005) 37 Cal.4th 428, 433-434.) Although appellant is correct no particular form of objection is required, an objection must at least "'be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.'" (*Partida, supra*, at p. 435.) Appellant's objections did not do so here.

Even if the argument was not forfeited, it is meritless. Evidence of a defendant's character is inadmissible only "when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Johnson's testimony did not fall within this rule because he said nothing about appellant's character. He simply testified to his

15

response to appellant's threats, which was informed by his background as a behaviorist. His experience prompted him to take certain actions, such as putting his hands at his side, in order to deescalate appellant's aggression toward him. Johnson's testimony also rebutted appellant's testimony that Johnson was aggressive toward him and the confrontation was mutual. And with regard to Johnson's testimony on cross-examination, it was responsive to defense counsel's question whether appellant "just shoved his cart back for no reason at all?" We find no error.[7]

### 5. CALCRIM No. 361

Appellant argues the trial court erred in instructing the jury with CALCRIM No. 361, which stated, "If the defendant failed in his testimony to explain or deny any evidence against him and if he could reasonably have expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant is guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure." We agree the giving of this instruction was error, but the error was harmless.

"The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' [Citation.] 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation].'" (*People v. Saddler* (1979) 24 Cal.3d 671, 681 (*Saddler*).) In determining whether the CALCRIM No. 361 instruction was warranted, we must "ascertain if defendant . . . failed

---

**7**  Because we find no evidentiary error, we reject appellant's contention cumulative evidentiary error warrants reversal.

16

to explain or deny any fact of evidence that was within the scope of relevant cross-examination." (*Saddler*, at p. 682.)

The Attorney General identifies numerous categories of evidence she claims appellant left unexplained, so the instruction was "not necessarily improper." We need not set these matters out here. It is sufficient to say we agree with appellant either he explained or denied this evidence, it was not within his knowledge, or it related to such minor details that it would not have warranted giving CALCRIM No. 361. (See *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469 (*Lamar*) [defendant did not fail to explain why victim would attempt to lie because defendant did not know victim's motivations]; *People v. Roehler* (1985) 167 Cal.App.3d 353, 393 [failure to recall "specific details" insufficient to support giving instruction].) We also disagree with the Attorney General that appellant's explanation of the evidence was so "bizarre and implausible" to warrant the instruction. (*People v. Sanchez* (1994) 24 Cal.App.4th 1012, 1029-1030 ["When a defendant testifies but fails to deny or explain inculpatory evidence or gives a 'bizarre or implausible' explanation, the instruction is proper."].)

But the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836, because there was no reasonable probability appellant would have achieved a more favorable result had the instruction not been given. (*Saddler, supra*, 24 Cal.3d at p. 683; *Lamar, supra*, 110 Cal.App.4th at pp. 1471-1472.) CALCRIM No. 361 gives the jury discretion that it "may" consider appellant's failure to explain or deny evidence, it expressly warns the jury that any failure to deny or explain "is not enough by itself to prove guilt," and it reiterates the burden of proof beyond a reasonable doubt remains with the prosecution. (See *Lamar, supra*, at p. 1472 [finding similar language in CALJIC No. 2.62 rendered error harmless]; *People v. Ballard* (1991) 1 Cal.App.4th 752, 756-757 [same].) The jury was also instructed consistent with CALCRIM No. 200, "Some of these instructions may not apply depending on your findings about the facts of the case. Do not assume that just because I give a particular instruction that I am assuming anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (See *Lamar, supra*, at p. 1472

17

["[T]he fact that juries are instructed, pursuant to CALJIC No. 17.31, to 'disregard any instruction which applies to a state of facts which you determine does not exist,' also mitigates any prejudicial effect related to the improper giving of CALJIC No. 2.62."]; see also *Saddler, supra*, at p. 684.)[8]  Further, as noted *ante*, the evidence against appellant was overwhelming, so there was no reasonable possibility appellant would have achieved a more favorable result if the trial court had not given CALCRIM No. 361.

## 6. Cumulative Error

We reject appellant's claim that cumulative errors warrant reversal because we have only found one error, which was harmless.

## DISPOSITION

The judgment is affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.

---

[8]     Appellant contends the cases finding harmless error from erroneously giving CALJIC No. 2.62 and CALJIC No. 17.31 should not apply in this case because CALCRIM No. 361 and CALCRIM No. 200 materially differ from those instructions. We disagree.  Similar cautionary language is contained in both CALCRIM No. 361 and CALJIC No. 2.62 (see *People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1066), and CALCRIM No. 200 and CALJIC No. 17.31 make the same basic point to the jury.

18