Filed 5/21/26  P. v. Lovett CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRETT EDWARD LOVETT,<br><br>    Defendant and Appellant. | 2d Crim. No. B339468<br>(Super. Ct. No. 17CR10694)<br>(Santa Barbara County) |

Brett Edward Lovett appeals from the judgment after a jury convicted him of grand theft (Pen. Code,[1] § 487, subd. (a); counts 1, 3, 5, 12, 13, 14, 16), securities fraud (Corp. Code, § 25541; counts 2, 4), burglary (§ 459; count 6), elder theft (§ 368, subd. (d)(1); counts 10, 15, 17), forgery (§ 470, subd. (a); counts 11, 18, 20, 21), and money laundering (§ 186.10, subd. (a)(1); counts 24, 26-36).  The jury found true that four of the victims were particularly vulnerable (Cal. Rules of Court, rule

---

[1] All unmarked statutory references are to the Penal Code.

4.421(a)(3); counts 12-18, 20, 21), the manner in which he carried out the crimes indicated planning, sophistication, or professionalism (*id.*, rule 4.421(a)(8); counts 1-6, 10, 12-18), the crimes involved great monetary value (*id.*, rule 4.421(a)(9); counts 1-6, 10, 12-14), and that he took in excess of $100,000 (§ 186.11; counts 1-5, 7-9, 12-14, 16, 18-21). The court sentenced appellant to an aggregate determinate term of 16 years, eight months in state prison. It ordered him to pay restitution to five victims totaling $699,841.85, doubled to $1,399,683.70 pursuant to section 186.11, subdivision (c).[2]

We will affirm the judgment but order the clerk to correct a clerical error in the abstract of judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Prosecutors charged appellant in 2017 for various financial crimes involving five victims. The crimes occurred between 2011 and 2015. This appeal concerns convictions relating to two of the five—Richard Bush and Ruby Revell—as well as money laundering convictions that were not tied to a particular victim. Our factual and procedural background focuses on these convictions.

*Richard Bush*

Bush met appellant at church in 2009. He loaned appellant $25,000 in 2011 to start a business called State DPS Legal Aid

---

[2] Section 186.11, subdivision (c) states that defendants convicted of two or more specified felonies and subject to the aggravated white collar crime enhancement described in subdivision (a) resulting in a taking of more than $500,000 "shall also be liable for a fine not to exceed five hundred thousand dollars ($500,000) or double the value of the taking, whichever is greater."

Information, Inc. (State DPS) that provided callers with advice and referrals in landlord-tenant matters. Bush had recently retired and saw the loan as an opportunity to invest the proceeds of his employer-sponsored 401(k). He wrote appellant a check with the word "investment" in the subject line. They memorialized the transaction in a document entitled "Unsecured Promissory Note" dated May 1, 2011 that provided for Bush to receive annual interest at eight percent. They executed an addendum in January of 2012 that raised interest to ten percent and provided for Bush to receive a ten percent equity stake "if the company turned out to be a profitable thing and they could turn around and sell it to someone else . . . ."

In 2012, Bush transferred the balance of his 401(k) to an individual retirement account (IRA) controlled by appellant. Appellant then transferred $105,000 from the IRA to a bank account entitled "Brett Lovett DBA Trust Capital Holding," ostensibly to invest in a motel construction project in Texas. They signed a promissory note dated March 26, 2012 in which appellant agreed to make a single balloon payment of $120,000 in April of 2014.

The loans went unpaid. Appellant confessed to Bush in 2015 that he owed money to other members of their church. He asked to use Bush's good credit to obtain corporate credit cards for a new company he was starting. Appellant would then transfer the cards into his own name within a month and use them to pay off his debts. Bush agreed. Appellant incurred over $21,000 in additional debt on three cards in Bush's name. He never repaid the loans or credit card charges. Bush and his wife lost their life savings.

*Ruby Revell*

Revell first spoke to appellant in mid-2011 when she called an organization called "Legal Aid Information" for help getting survivor benefits from her late grandmother's pension plan. A 2010 car accident had left her paralyzed and confined to a wheelchair. They met in person on July 27, 2011. Revell signed a general power of attorney allowing appellant to "[o]pen, maintain or close bank accounts" on her behalf. The document was then notarized and signed by two of Revell's friends as witnesses.

Revell purportedly signed a second document entitled "Agreement" on the same day. This one was not witnessed or notarized. It stated: "I, Ruby R. Revell enter into this written agreement and General Power of Attorney for services on this date with Brett Lovett. It is my understanding that my mother Yvonne Ryan has deceased with no last will and testament and as such I, as her only surviving heir need assistance in ascertaining if I have any claim to assets or valuables left behind in her name. [¶] I have no available monetary means to pay for services needed and due to my current financial situation so agree to the terms set forth here, namely: a) If any account(s), life insurance proceeds, pension plans, or death benefits are located and attainable, I request that the full sum of these benefits be received by Ruby R. Revell, and I will not pay a percentage or fee for the assistance needed to acquire such funds. [¶] b) If any interest in real property is found, and that real property is found to have equitable value, I agree for services rendered on my behalf that I ask for the first 15% of any value, if any value is found, come to me Ruby R. Revell as beneficiary, and *I relinquish any right to any percentage of value up and above*

4

*15% in any real property found to have any equitable value for services rendered on my behalf.*" (Italics added.)

Appellant had already "found" an interest in real property by this time—a house owned by Revell's late mother through a family trust. Two weeks earlier appellant had sent a letter to Gary Ryan, Revell's uncle and the trust's successor trustee, on the letterhead of Legal Aid Information. It said, "our office has been retained by Ms. Ruby Revell in relation to her legal right to file for 'LETTERS OF ADMINISTRATION' as next of kin and the only child of the above mentioned deceased with the Superior Court of Orange County Probate Dept." The letter asserted Revell was "entitled to her mothers [sic] 50% share" of a single-family house owned by the trust in Buena Park.

Appellant eventually persuaded Ryan to sell the house. Ryan received a letter signed by attorney Robert C. Burlison, cc'd to "bl," in December of 2011. The letter demanded he deposit Revell's share of the sale proceeds—$114,646—into "the State DPS account" within 24 hours. He did so. Ryan communicated only with appellant during this time because he assumed appellant was her attorney. Appellant admonished Ryan that Revell "was not entitled to any information other that what you have provided our office as Trustee" and that "she will receive what the State allows here to receive, until then she has to wait."

Revell grew suspicious when appellant would not pay her after the house sold. The law firm of Hess-Verdon & Associates agreed to represent her on a contingency basis. They demanded an accounting and served a "Revocation of Power of Attorney for Finance" on September 21, 2012. Appellant sent them an "Escrow Account Statement" that reflected only about $53,000 of the proceeds remained. Revell petitioned for an accounting in

Los Angeles Superior Court when her attorney's attempts to collect the funds failed.[3]  She died in 2013 without receiving payment.  Her daughter pursued civil claims against appellant on behalf of the estate.  After trial, the probate court found appellant defrauded Revell and awarded her estate the entire $114,646 sent to appellant from the house sale, doubled for bad faith breach of duty, plus punitive damages.

*Charges and Trial*

Prosecutors filed a 29-count felony complaint against appellant in October of 2017.  At the time of trial in January of 2024, a 36-count amended information charged him with securities fraud and burglary relating to Bush, grand theft relating to Revell, and money laundering arising from his transfer of funds between various bank accounts he controlled.  Bank records showed appellant deposited most victims' money into checking accounts he used to pay personal expenses.  These expenses included dining out, vacations, car rentals, groceries, hair loss supplies, cosmetic procedures, private school tuition for his children, utilities, and hundreds of ATM cash withdrawals.

A forensic accountant described appellant as running a classic Ponzi scheme.  He testified, "[W]hat happens in a Ponzi scheme is money from newer investors is being used to pay off older investors.  And oftentimes a promoter of a scheme will tell investors that they are going to make money with their investment and that he's going to invest their money and return their original principal plus profit.  In this case there wasn't any

---

[3] *In re Matter of Ruby Revell* (Super. Ct. L.A. County, 2013, No. BP140980).  The court takes judicial notice of the filing date of the petition (April 29, 2013) on its own motion.  (Evid. Code, § 452, subds. (b) & (d).)

type of investment that was made.  I looked through those transactions.  I didn't see purchases of any kind of stocks or anything like that or investing in some kind of business venture.  So the money that's being returned to the investors is money from subsequent investors because as I mentioned earlier the defendant was spending most of the money on living his lifestyle and so in order to repay earlier investors he need[ed] to have new money coming in from subsequent investors."

Prosecutors also introduced a 2007 consent order entered in federal court between appellant and the U.S. Commodities Futures Trading Commission.  Appellant agreed to pay over $315,000 in restitution to two members of his former church who agreed to let him trade commodities on their behalf.  The commission found appellant never registered with the commission as a commodities broker and used the money he received for personal expenses, family transfers, and repayments to other customers of his self-described financial advisory business, Northwest Asset Fund.  It concluded appellant "willfully violated [section] 4b(a)(2)(i) and (iii) of the [Commodity Exchange] Act" by misappropriating customer funds and misrepresenting the risk of commodities trading.

The jury found appellant guilty on 29 of 36 counts.  It found true allegations that Revell was particularly vulnerable.  The court ordered appellant to pay restitution of $141,061.79 to Bush and $114,646.01 to Revell's estate.

DISCUSSION

*Securities Fraud Convictions*
*(Victim Bush)*

Appellant contends insufficient evidence supports his convictions for securities fraud (counts 2 and 4).  He argues the

7

two promissory notes given to Bush do not meet the statutory definition of a security. Our review is limited to whether the record contains substantial evidence, contradicted or not, supporting the jury's verdicts. (*People v. Martinez* (2017) 10 Cal.App.5th 686, 706.) We conclude it does.

"Corporation Code section 25019 defines a 'security' expansively, and includes 'participation in any profit-sharing agreement' or an 'investment contract,' whether or not a written document evidences the investment." (*People v. Frederick* (2006) 142 Cal.App.4th 400, 413.) "An 'investment contract' is '"a contract or a transaction in which a person entrusts money or other capital to another, with the expectation of deriving a profit, income or some financial benefit from a business enterprise, the failure or success of which is dependent upon the managerial efforts of other persons."'" (*Ibid.*, quoting *People v. Smith* (1989) 215 Cal.App.3d 230, 235.) "Whether an investment constitutes a security is a question for the finder of fact." (*People v. Butler* (2012) 212 Cal.App.4th 404, 414.) The record shows both notes fall within this definition.

The Unsecured Promissory Note dated May 1, 2011 (the basis of count 2) specifies loan terms but does not expressly refer to an investment or business enterprise. Bush testified, however, that appellant sought the $25,000 loan as a "way to financing them starting this company and having a profitable business that they could make money on, and that I could get eight percent on." He gave appellant the money several months before they executed the note. The subject line of the check described its purpose as an investment. The note identifies the purported business, i.e., "State DPS Legal Aid Information, Inc.," as the borrower instead of appellant. The January 2012 amendment

8

stated Bush would be entitled to ten percent of the sale proceeds if the principal remained unpaid after five years and appellant sold the business. Bush testified "the idea [was] that once they had a real good profitable business going they could turn around and sell it."

The promissory note dated March 26, 2012 (the basis of count 4) also does not refer to an investment or business enterprise, but Bush's testimony again completes the story. He described appellant approaching him about investing in a motel construction project in Texas adjacent to oil production sites. "I believe the whole idea of it," he testified, "was this investment to the company in Texas that was building the motel. It was for that purpose that this – they were borrowing $100,000 from me to finance their project as an investor." When asked what appellant told him about the company, Bush responded, "You know, a term that comes to my mind – he mentioned that he was an ombudsman. And I don't know – somehow he was – had a position within the people in Texas who were building this motel. He was now working with them. And I guess – well, you know, it was a way of investing with them. And he was using the [$]100,000 that I was supplying to be a part of the operation of what they were creating."

Appellant next contends the trial court instructed the jury incorrectly on counts 2 and 4 because it did not define "common enterprise" in the context of an alleged violation of Corporations Code section 25019. If the instruction was potentially misleading or incomplete, appellant had a duty to object or request a clarifying advisement. (*People v. Thomas* (1990) 219 Cal.App.3d 134, 145.) He did not. The issue is forfeited. (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

Appellant asserts the issue is not forfeited, however, because the term was sufficiently vague to trigger the court's sua sponte instructional duties and because the error affected his substantial rights.  We review this contention de novo, considering the challenged instructions in the context of the instructions and the record as a whole "'to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 326; *People v. Posey* (2004) 32 Cal.4th 193, 218.)

The jury instructions defined "security" as follows:  "'[A]ny note, stock, evidence of indebtedness, preorganization certificate or subscription, transferable share, or investment contract.  [¶]  A financial transaction or relationship is an investment contract, and therefore a security, if all of the following elements are present:  [¶] 1. A person entrusted money or other capital to another; [¶] 2. The person who entrusted the money or capital to another did so with the expectation of receiving a profit, income, or some financial benefit from a common enterprise; AND, [¶] 3. The failure or success of the common enterprise was dependent on the managerial efforts of persons other than the person who entrusted the money or other capital."

Appellant argues that failing to further define "common enterprise" as a separate *business* endeavor allowed the jury to equate the loan itself—i.e., the agreement to pay back the two loans with interest—as the "enterprise[s]" prosecutors needed to prove existed.  He asserts this effectively eliminated the "common enterprise" element of securities fraud on both counts.

The trial court's sua sponte duty to instruct extended to defining those terms "having a technical meaning peculiar to the law.  [Citations.]" (*People v. Elam* (2001) 91 Cal.App.4th 298,

306.) Nothing in the record suggests the jury required additional technical instruction, or that it might have interpreted or applied the instruction in a way that lightened the burden of prosecutors by equating the notes themselves to the "common enterprises" they needed to prove. Bush testified forthrightly that he loaned appellant money on both occasions to invest in business opportunities. The prosecutor argued in closing that "[t]he outcome of those notes, assuming that these actually were real businesses, it wasn't dependent on Mr. Bush at all. It was dependent on [appellant] to put in the work, to go out there and find investments, run a business." The trial court properly instructed the jury on these counts.

*Burglary Conviction*
*(Victim Bush)*

Appellant contends his conviction for burglary (count 6) is not supported by sufficient evidence. The People alleged that "[o]n or between October 1, 2015 and October 31, 2015" appellant "did enter an inhabited dwelling house . . . occupied by [Bush], with the intent to commit larceny and any felony." Appellant argues this "invited the jury to conflate all of [the] appellant's conduct during the month of October 2015 as support for a single claim of burglary," allowing prosecutors to secure his conviction without proving he entered Bush's house on a specific day with the required mental state. We disagree.

Bush testified that appellant approached him in late 2015 about his debts to other members of their church. Appellant asked to use Bush's credit "as a reference or as a backup for himself" to apply for corporate credits cards. Appellant stated he would use his credit "for about a month" and then Bush would be "completely out of the arrangement."

11

Prosecutors introduced emails between appellant and Curtis Browne, a credit consultant, from around this time. Appellant sent him Bush's credit report on Thursday, October 15, 2015. Browne responded that "[Bush's] scores are great" and that he would seek preapproval for credit in his name. Appellant emailed Browne as follows the next day: "Question – When does [Bush] withdraw from the cards and the corporation? After we have received the cards? Then we notify card issuers he is no longer with company and everything and all liability is switched into my name solely? With no liability to [Bush] correct?" Browne responded, "It's a good idea can take over everything formerly once we have fixed your credit. That will be in short order though." Appellant said he would get Bush's "signature and the card information" by that night or Saturday morning.

Appellant still did not have the signature or information on Monday morning, October 19. He emailed Browne at 7:47 a.m. saying that he intended to visit Bush's house that day. He wrote: "Didn't forget about getting you [Bush's] card info and agreement over the weekend. [¶] I just wanted to clarify something before [Bush] and I proceeded. This is not a question he brought up but that I am bringing up . . . . [¶] Once we proceed through funding I was hoping, and I kinda of packaged it this way to him that he could withdraw from the corporation and that I would take over as director and assume the credit cards and all liability . . . . Before I wrote any checks, the reason I bring this up is it might be somewhat unnerving if he is the primary card holder and I'm writing a check for $75,000 you know what I mean . . . . This is not a deal breaker with him, we have such a relationship that he would likely still do that for me until as you mentioned my credit is in a better place, but i will have to work a little harder to make

12

him not worry that he ultimately is not responsible . . . . [¶] Anyway just throwing out there if it is at all possible to transfer ownership of this Corp sometime soon at least after we receive funding that would be best case scenario. [¶] Ok let me know, I will be heading over to [Bush's] this morning between 11:00 - 12:00 will scan and forward you agreement and card info . . . ." Browne responded as follows about two hours later: "You can take over as President and CEO of the corporation at any time and have sole power of the corporation. However, to be clear - until your credit is better and you formally take over the credit cards and [Bush] removes himself from that liability - *he could still potentially be liable in the case of default on those cards. Just make real sure your plan allows for paying back the cards and you'll be fine.*" (Italics added.)

Appellant and Browne emailed on Tuesday, October 20 and Wednesday, October 21 about charging $4,600 and $4,400 on two of Bush's cards to buy "aged" shell corporations that could more easily obtain corporate credit. Bush testified appellant did not warn him about these charges and discovered them only when he received statements in the mail that December. He also found appellant had charged personal expenses, eventually incurring over $21,000 on three cards. He never removed Bush or his wife from the accounts or paid them back.

Appellant argues these emails show he did not intend to commit theft when he visited Bush's house to get the information needed to receive the cards. We decline to interpret and reassemble the evidence to fit appellant's alternative factual narrative. Reversing for a lack of sufficient substantial evidence is not warranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the

13

conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755.)

The jury heard evidence that appellant solicited Bush's personal information for the purpose of opening credit accounts to pay debts owed to others. He secured Bush's approval by representing he would promptly remove Bush from the accounts once opened. The credit consultant confirmed on the morning of October 19, 2015, that Bush would remain liable until appellant could improve his credit and pay off any charges incurred. Appellant—already deeply in debt to Bush and others—confirmed he would visit Bush later that morning to get the information needed to open the accounts. He began charging thousands of dollars to the accounts *the next day*, in Bush's name, without his permission. This quickly grew to over $21,000. Jurors could infer from this evidence that appellant entered Bush's house on October 19 "with the intent to commit larceny and any felony," i.e., to access credit he could not and would not pay back to Bush.

*Forgery and Grand Theft Convictions*
*(Victim Revell)*

Appellant contends the prosecutors failed to charge him with forgery (count 11) and grand theft (count 12) within the four-year statute of limitations. (§§ 801.5, 803, subd. (c)(1).) He raised the issue below. The jury was instructed on the applicable limitations periods but still convicted him on both counts. "When an issue involving the statute of limitations has been tried, we review the record to determine whether substantial evidence supports the findings of the trier of fact." (*People v. Castillo* (2008) 168 Cal.App.4th 364, 369.) We conclude both counts were timely filed.

14

Count 11 is based on the allegation appellant forged the name of attorney Robert Burlison on the December 2011 letter to Gary Ryan demanding Revell's 50 percent share of the house sale proceeds. Appellant argues Revell had discovered or should have discovered the forgery no later than when she revoked his power of attorney on September 21, 2012. We disagree. "The limitations period is triggered when either the victim or a responsible law enforcement official learns of facts which, if investigated with reasonable diligence, would make that person aware a crime had occurred." (*People v. Rodriguez* (2021) 71 Cal.App.5th 921, 930 (*Rodriguez*).) Here, Revell sought counsel after appellant refused to disperse the proceeds of her share of the house sale—not because she suspected appellant forged an attorney's name on a document. Appellant's conduct may have notified Revell of potential financial impropriety but nothing in the record shows she received the letter, and, assuming she did, why she would have initially doubted the signature's authenticity.

Count 12 is based on allegations that appellant committed theft when he took the $114,646.01 in house sale proceeds from Revell. Appellant contends similarly that Revell's "act of revoking appellant's power of attorney [on September 12, 2012] unequivocally proved she had become aware of facts that should have alerted her to the facts underlying the charge of grand theft" by that date. He argues the limitations period thus expired more than a year before prosecutors charged him. Here the People concede, stating the revocation "indicated [Revell] no longer believed appellant was acting in her best interests." They agree we should reverse count 12 and remand the case for resentencing. We do not accept the concession.

15

"[D]iscovery of a loss by the victim alone is insufficient to trigger the limitations period. [Citation.] 'The question is whether there is sufficient knowledge *that a crime has been committed.*'" (*Rodriguez, supra*, 71 Cal.App.5th at p. 930, italics added.) "The issue of when [a crime] was discovered or could have been discovered through the exercise of reasonable diligence presents questions for the trier of fact to decide." (*Ibid*.) The jury here did not have the benefit of Revell's testimony because she died a decade before trial. It was left to infer her knowledge and state of mind through extensive documentary evidence and the testimony of others. The relevant question, however, is not whether she discovered appellant was not acting in her best interests during the limitations period—it is whether she discovered appellant had *committed a crime against her* during this period.

The revocation itself states nothing about the basis of Revell's decision to revoke appellant's powers. Revell's attorney testified his office served the revocation in September of 2012 "because there was still money outstanding that he had collected purportedly under this Power of Attorney. And we wanted to make sure that that money wasn't distributed or we could somehow try to secure it." The firm petitioned for an accounting in probate court in April of 2013 but the original petition was not admitted into evidence at trial.[4] Revell's attorney testified his office received an "Escrow Account Statement" signed in February of 2012 that showed appellant received $60,458.96 "per POA" and that $53,040.59 remained in an escrow account at

---

[4] The court admitted Revell's first amended petition (her estate's operative pleading) as an exhibit but instructed jurors not to take its allegations for their truth.

Burlison Law Group. Appellant did not serve an accounting of the proceeds in the probate litigation until April of 2014. Revell's attorneys did not depose him until they were approaching trial in 2015.

The jury heard this evidence and more—we count 17 witnesses and more than 150 numbered exhibits—over the course of ten days. The court instructed it properly on the statute of limitations. The jury convicted appellant on count 12 nonetheless. The record amply supports the finding that his deceits obfuscated the full nature and scope of his illicit activities well into the limitations period. We assume the jury understood its instructions and decline to substitute our judgment of the evidence it considered.

*Money Laundering Convictions*

The jury convicted appellant on twelve counts of money laundering under section 186.10, subdivision (a)(1). Appellant contends two of these convictions, i.e., counts 28 and 32, are based on insufficient evidence because the trial court recited the incorrect mental state for those crimes when it instructed the jury. Again, he raised no objection to the instruction below. The issue is likewise forfeited. Anticipating this, appellant argues that defense counsel's failure to object constituted ineffective assistance of counsel. We disagree.

The money laundering statute (section 186.10) allows prosecutors to prove the defendant's mental state in one of two ways, i.e., by showing the defendant conducted or attempted to conduct specified financial transactions "(1) with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument

17

represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering." (§ 186.10, subd. (a).) Here, prosecutors charged appellant under subdivision (a)(1), alleging that he conducted the relevant transactions "with the intent to promote, manage, establish, carry on," etc. The instructions submitted to the court by the parties and thereafter read to the jury, however, cited the mental state set forth in subdivision (a)*(2)*, stating "the People must prove that the Defendant . . . knew that the monetary instruments represented the proceeds of criminal activity or were derived directly or indirectly from the proceeds of criminal activity." Prosecutors quoted the latter in closing argument without drawing an objection from the defense.

Establishing a claim of ineffective assistance of counsel requires appellant to demonstrate counsel's performance was deficient and he suffered prejudice as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674] (*Strickland*); *People v. Mickel* (2016) 2 Cal.5th 181, 198.) To demonstrate deficient performance, appellant must show counsel's performance fell below an objective standard of reasonableness. (*Mickel*, at p. 198.) To demonstrate prejudice, he must show a reasonable probability that but for counsel's deficient performance the outcome of trial would have been different. (*Ibid*.) An ineffective assistance claim fails upon a defective showing of either component. (*People v. Holt* (1997) 15 Cal.4th 619, 703.) Appellant shows neither.

Defense counsel's performance did not fall below an objective standard of reasonableness considering the number and complexity of the charges against his client. The information included 36 felony counts involving seven victims. The parties

18

submitted 75 pages of jury instructions to the trial court. Defense counsel's neglecting to flag an inconsistency that had also evaded the detection of the court and prosecutors was hardly "outside the wide range of professionally competent assistance." (*Strickland*, *supra*, 466 U.S. at p. 690.)

Even if counsel performed deficiently, the record confirms no prejudice resulted. The jury still found appellant harbored one of the two mental states required to establish money laundering under section 186.10. Appellant does not propose how he would have altered his theory of the case—i.e., that he obtained the alleged victims' money by permission rather than by theft or embezzlement—had prosecutors proved their case using subdivision (a)(1) instead of (a)(2) or the court instructed the jury on the former. Substantial evidence supports the convictions.

Appellant scrutinizes the testimony of the prosecution's forensic accounting expert and the exhibits supporting that testimony. This goes to the weight of the evidence and witness credibility. Here we defer again to the trier of fact. (See *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614 ["In reviewing a claim of insufficiency of evidence, the appellate court must consider the whole record, view the evidence in the light most favorable to the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to the trier of fact's determination of the weight and credibility of the evidence."].)

*Penal Code Section 654*

As recommended in the probation sentencing report, the court stayed four of appellant's convictions at sentencing pursuant to section 654. It stated: "So Counts 1 and 2 were 654 and 2 had the greater punishment, so we're sentencing on 2. Counts 3 and 4 were 654, and 4 had the greater punishment. 14

19

and 15 were 654 and therefore 15 carries a greater punishment and 14 will be stayed. 16 and 17 are 654 and 17 carries greater punishment, so 16 is stayed."

Appellant contends this shows the trial court applied the prior version of section 654, which required imposing the "longest potential term of imprisonment" when sentencing a defendant convicted of two or more crimes for the same act. The People argue it is unclear whether the court applied current law and request we remand for clarification. The current version of section 654 went into effect two and a half years before appellant's sentencing. "Absent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390.) Appellant did not object or raise any issue regarding the court's application of section 654. Although failure to stay execution of a sentence under section 654 is not subject to forfeiture because it results in an unauthorized sentence (*People v. Hester* (2000) 22 Cal.4th 290, 295), here the court did stay execution of the related counts. We therefore conclude appellant has forfeited his claim. (*People v. Scott* (1994) 9 Cal.4th 331, 351-353 ["the waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"].)

*Corrections to Abstract of Judgment*

The parties agree the trial court imposed one-third the middle term (i.e., one year) on count 4 for securities fraud but did not mark the appropriate box on the abstract of judgment with an "X." Here we agree and will direct the clerk to correct the error. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [courts may correct clerical errors at any time].)

20

DISPOSITION

The judgment is affirmed. The superior court clerk is directed to correct the abstract of judgment to reflect appellant's one-year sentence on count 4 is one-third the middle term. The corrected abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


CODY, J.


We concur:


YEGAN, Acting P.J.


BALTODANO, J.

Pauline Maxwell, Judge
Superior Court County of Santa Barbara

_____

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.